UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| John S. Uphoff,<br><br>Plaintiff,<br><br>vs.<br><br>Geoffrey LeMond and Capture Design Ventures 03, LLC,<br><br>Defendants. | No.: 0:25-CV-04128-ECT-DLM<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER RULES 12(B)(6) AND 12(C)** |
| Geoffrey LeMond and Capture Design Ventures 03, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>John Uphoff, Matt Duea, Anthony Brennan, Allen Temiz, Raw Entertainment B.V. d/b/a Roobet, Raw Entertainment Ltd. d/b/a Roobet, Packdraw Limited, Packdraw US LLC, and PDCC Services Limited,<br><br>Defendants. | No.: 0:25-CV-04152-ECT-DLM |

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**FACTUAL BACKGROUND** .......... **3**

**LEGAL STANDARD** .......... **5**

**ARGUMENT** .......... **6**

**I. THE COMPLAINT PLAUSIBLY ALLEGES THAT UPHOFF BREACHED FIDUCIARY DUTIES OWED TO THE PARTNERSHIP AND TO LEMOND.** .......... **7**

A. Uphoff Violated the Statutory Duty Not to Compete. .......... 8

B. Uphoff Diverted a Partnership Opportunity. .......... 9

C. Uphoff Used Partnership Property for Personal Benefit. .......... 10

D. Uphoff Concealed His Conduct in Breach of Fiduciary Disclosure Duties. .......... 13

**II. THE COMPLAINT PLAUSIBLY ALLEGES CIVIL CONSPIRACY AND AIDING AND ABETTING AS TO DUEA AND THE ROOBET DEFENDANTS.** .......... **17**

A. Civil Conspiracy. .......... 17

B. Aiding and Abetting. .......... 19

**III. THE COMPLAINT PLAUSIBLY ALLEGES TRADE SECRET MISAPPROPRIATION.** .......... **23**

A. The Trade Secrets Are Adequately Identified. .......... 23

B. Secrecy Measures Are Adequately Pleaded. .......... 26

C. Misappropriation Is Plausibly Alleged. .......... 30

**IV. THE UNJUST-ENRICHMENT CLAIM SHOULD NOT BE DISMISSED IN FULL AT THE PLEADING STAGE.** .......... **33**

**V. EXHIBIT A AND THE ENTITY-SPECIFIC ALLEGATIONS DO NOT WARRANT DISMISSAL.** .......... **36**

A. The Exhibit A Argument Is a Record-Completeness Issue, Not a Pleading Deficiency. .......... 36

B. The Entity-Specific Allegations Satisfy Rule 12. .......... 37

**CONCLUSION .......... 40**

## TABLE OF AUTHORITIES

**Cases**

*Absolute Sports Cards, LLC v. Thornton*,
No. A24-0215, 2024 WL 4260268 (Minn. Ct. App. Sept. 23, 2024) .................. 21

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
59 F.4th 948 (8th Cir. 2023) ........................................................ 11, 28, 38

*Ahlgren v. Cap. One Bank (USA),*
N.A., No. 19-cv-1607, 2020 WL 618236 (D. Minn. Feb. 10, 2020) .................... 41

*Appletree Square I Ltd. P'ship v. Investmark, Inc.*,
494 N.W.2d 889 (Minn. Ct. App. 1993) ................................................ 13, 19

*Aries Info. Sys., Inc. v. Pac. Mgmt. Sys. Corp.*,
366 N.W.2d 366 (Minn. Ct. App. 1985) ...................................................... 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................... 10

*Ashley Cnty. v. Pfizer, Inc.*,
552 F.3d 659 (8th Cir. 2009) ............................................................ 10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................... 23

*Berreman v. West Publ'g Co.*,
615 N.W.2d 362 (Minn. Ct. App. 2000) ................................................ 18, 22

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) .............................................................. 8, 10

*Childress v. Taylor*,
945 F.2d 500 (2d Cir. 1991) ................................................................ 17

*D.A.B. v. Brown*,
570 N.W.2d 168 (Minn. Ct. App. 1997) .......... 22

*Electro-Craft Corp. v. Controlled Motion, Inc.*,
332 N.W.2d 890 (Minn. 1983) .......... 34

*Evans v. Blesi*,
345 N.W.2d 775 (Minn. Ct. App. 1984) .......... 21

*4Brava, LLC v. Sachs*,
No. 15-2744 (JRT/DTS), 2017 WL 1194195 (D. Minn. Mar. 30, 2017).......... 20

*Gilk v. Fisher*,
No. 25-2158, 2025 WL 1920496 (D. Minn. July 11, 2025).......... 33, 34, 37

*Harding v. Ohio Cas. Ins. Co.*,
41 N.W.2d 818 (Minn. 1950) .......... 22

*Hepfl v. Meadowcroft*,
9 N.W.3d 567 (Minn. 2024) .......... 41, 42

*Jostens, Inc. v. Nat'l Computer Sys., Inc.*,
318 N.W.2d 691 (Minn. 1982) .......... 36

*Kamal v. Baker Tilly US, LLP*,
No. CV 21-1549, 2022 WL 1050053 (D. Minn. Apr. 7, 2022) .......... 26, 27

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .......... 37

*Klein v. First Edina Nat'l Bank*,
293 Minn. 418, 196 N.W.2d 619 (1972) .......... 19

*Micro Display Sys., Inc. v. Axtel, Inc.*,
699 F. Supp. 202 (D. Minn. 1988) .......... 40

*Miller v. Miller*,
222 N.W.2d 71 (Minn. 1974) .......................................................................... 15

*Nathan v. St. Paul Mut. Ins. Co.*,
251 Minn. 74, 86 N.W.2d 503 (1957) ........................................................... 23, 24

*Orbital Eng'g, Inc. v. SEH*,
No. 25-cv-02121, 2025 WL 3251425 (D. Minn. Nov. 21, 2025) .......................... 30

*PJ Acquisition Corp. v. Skoglund*,
453 N.W.2d 1 (Minn. 1990) ........................................................................ 18, 22

*Polaris Indus., Inc. v. Mangum*,
690 F. Supp. 3d 966 (D. Minn. 2023) ................................................................ 41

*Prairie Field Servs., LLC v. Welsh*,
497 F. Supp. 3d 381 (D. Minn. 2020) ................................................................ 34

*Protégé Biomedical, LLC v. Z-Medica, LLC*,
394 F. Supp. 3d 924 (D. Minn. 2019) ..................................... 30, 33, 35, 36, 39, 47

*Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*,
149 F.4th 1081 (9th Cir. 2025) ............................................................................ 31

*R.J. Zayed v. Associated Bank, N.A.*,
913 F.3d 709 (8th Cir. 2019) ............................................................................... 26

*Rensch v. Reger*,
No. 10-cv-03679, 2011 WL 13233340 (D. Minn. June 20, 2011) ................... 19, 20

*Schwan's Co. v. Cai*,
No. 20-2157 (JRT/HB), 2021 WL 5745791 (D. Minn. Dec. 2, 2021) ................... 41

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*,
292 F. Supp. 2d 1173 (D. Minn. 2003) ................................................................ 40

*Tatone v. SunTrust Mortg., Inc.*,
857 F. Supp. 2d 821 (D. Minn. 2012) .................................................................. 23

*TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*,
No. 12-cv-01197, 2013 WL 6827348 (D. Minn. Dec. 23, 2013)........................... 31

*Triple Five of Minn., Inc. v. Simon*,
404 F.3d 1088 (8th Cir. 2005) ....................................................... 13, 15, 19, 21, 28

*Varga v. U.S. Bank Nat'l Ass'n*,
764 F.3d 833 (8th Cir. 2014) ........................................................................ 25, 27

*In re Villa Maria, Inc.*,
312 N.W.2d 921 (Minn. 1981) ............................................................................ 15

*Witzman v. Lehrman, Lehrman & Flom*,
601 N.W.2d 179 (Minn. 1999) ................................................................ 24, 25, 28

*Wyeth v. Nat. Biologics, Inc.*,
395 F.3d 897 (8th Cir. 2005) .................................................. 32, 33, 35, 36, 37, 38

**Statutes**

17 U.S.C. § 101 ..................................................................................................... 16
18 U.S.C. § 1839(3).................................................................................................. 31
18 U.S.C. § 1839(5).................................................................................................. 37
Minn. Stat. § 322C.0110, subd. 4(1)(iii) ................................................................... 22
Minn. Stat. § 323A.0101(9)........................................................................................ 13
Minn. Stat. § 323A.0202(a) ........................................................................................ 13
Minn. Stat. § 323A.0204 ............................................................................................ 18
Minn. Stat. § 323A.0404(b)(1), (3) .................................... 7, 12, 13, 14, 15, 17, 19, 33, 37
Minn. Stat. § 323A.0603(b)...................................................................................... 7, 13
Minn. Stat. § 323A.0802 ............................................................................................ 13
Minn. Stat. § 325C.01, subd. 3 .................................................................................. 37
Minn. Stat. § 325C.01, subd. 5 ..................................................................... 29, 31, 32
Minn. Stat. § 325C.07(a) ............................................................................................ 40

**Rules**

Fed. R. Civ. P. 11(b)(3) ........ 29
Fed. R. Civ. P. 15(a) ........ 39, 47
Fed. R. Civ. P. 8(d)(2)–(3)........ 39

## INTRODUCTION

Plaintiffs Geoffrey LeMond and Capture Design Ventures 03, LLC (collectively, "Plaintiffs") respectfully submit this Memorandum in Opposition to Defendants John Uphoff, Matt Duea, Anthony Brennan, Allen Temiz, Raw Entertainment B.V. d/b/a Roobet, Raw Entertainment Ltd. d/b/a Roobet, Packdraw Limited, Packdraw US LLC, and PDCC Services Limited's (collectively, "Defendants") Motion to Dismiss Plaintiffs' Claims.

Defendants' motion asks the Court to do what Rule 12 forbids: isolate individual allegations, disregard the Complaint's overall narrative, and demand evidentiary detail that can come only through discovery. Read as a whole and with reasonable inferences drawn in Plaintiffs' favor—as Eighth Circuit precedent requires—the Complaint plausibly alleges that Uphoff used partnership work product and a partnership-generated business opportunity to build a competing product for Roobet, concealed that conduct from his partners, and helped channel the resulting benefits to Roobet and the Packdraw entities.

The Complaint's content is straightforward: Roobet wanted the Partnership's concepts, design work, software, and technical skill without consummating the broader deal that had been represented as imminent. So Roobet represented to Plaintiffs that bringing Uphoff inside as a contractor temporarily to address a handful of discrete infrastructure issues was the final step before the broader collaboration with Plaintiffs would move forward. Instead, Uphoff quickly pivoted to building Packdraw for Roobet, using materials imported from the Partnership's internal 'Final Wowdao' Figma file and likely Partnership code, while Plaintiffs were kept in the dark and the Partnership's own products stagnated. Drawing inferences in Plaintiffs' favor, those facts plausibly state claims for breach of

fiduciary duty, conspiracy, aiding and abetting, trade-secret misappropriation, and unjust enrichment.

This is not a case in which Defendants can plausibly argue that Plaintiffs have identified no concrete projects, no concrete counterparties, and no concrete timeline. Defendants' own Joint Answer admits that Uphoff developed the same named projects Plaintiffs identify — "including unicorn.pizza, crash.xyz, The House, WowDAO, Packs.com, Token Wars and Prize" — provided services to Raw Entertainment during the relevant period, and that Packdraw launched in August 2023. (Answer ¶¶15, 22, 25, 34, 37.) Also, this is not a case about an employee leaving with generalized know-how; it is a case about a co-founder's diversion of a live venture track into a competing product for the very counterparty negotiating to fund the venture.

Minnesota law is especially unfavorable to the theory advanced by Defendants' motion. The partnership statute expressly bars a partner, such as Uphoff,[1] from deriving personal benefit from property acquired or developed for the partnership, appropriating partnership opportunities, or competing with the partnership before dissolution. Minn. Stat. § 323A.0404(b)(1), (3). That duty not to compete is *categorical* while the partnership persists. Minn. Stat. § 323A.0603(b). The motion's recurring themes—that LeMond consented to some Roobet work, that the Roobet deal supposedly 'went nowhere,' and that Plaintiffs did not describe every last detail about the stolen code or designs with grueling specificity—do not defeat plausibility.

[1] Defendants expressly "accept the allegation" that LeMond and Uphoff formed a partnership "as true for purposes of this Motion." (Defs.' Mem. at 2 n.1.)

A motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). It is error for a court to "ignor[e] reasonable inferences supported by the facts alleged" or to "dr[a]w inferences in appellees' favor." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009). But that is precisely what the Motion invites by characterizing the Complaint's allegations as 'vague,' 'confusing,' or 'conclusory' while ignoring the overall narrative and neglecting to draw inferences in Plaintiffs' favor. Defendants likewise invite error by relying on inapposite case law decided on fully developed evidentiary records at later procedural stages, or materially different factual backgrounds that did not involve a similar co-founder diversion of a live venture opportunity into a competing product, as the Complaint describes here. For the reasons set forth herein, the Motion should be denied in its entirety.

## **<u>FACTUAL BACKGROUND</u>**

For purposes of this Motion, the Court must accept the following allegations as true: LeMond and Uphoff formed a partnership in 2021 to develop blockchain-based games of chance. (Compl. ¶¶22-23.) LeMond handled design and user experience, while Uphoff handled software, technical models, and blockchain code. (Compl. ¶23.) Together with others hired by the Partnership, they raised approximately $842,000 from investors for the venture. (Compl. ¶24.) LeMond and Uphoff then jointly developed a series of products including, but not limited to, Prize, TokenWars, and Packs.com. (Compl. ¶25.)

Roobet then sought access to the partners' work product. Between 2021 and 2022, Roobet and the Partnership negotiated a joint venture agreement, with Defendants Duea, Brennan, and Temiz participating materially in those discussions. (Compl. ¶¶26-31.) By June 2022, the parties' negotiation converged on a deal under which Plaintiffs' product, Prize, would integrate with Roobet, and Roobet would invest approximately $3–5 million in development and marketing for the contemplated tokened-games component. (Compl. ¶31.) Roobet sought the partnership's game concepts, design, software code, and technical skill, while the Partnership sought Roobet's financing and marketing reach. (*Id.*)

In July 2022, Duea and Temiz assured LeMond the deal was close at hand. (Compl. ¶32.) As the final step prior to finalizing the deal, Duea asked to speak directly with Uphoff, representing that Roobet wanted to engage Uphoff temporarily to fix discrete infrastructure issues within Roobet. (Compl. ¶33.) Relying on Duea's representation that these infrastructure fixes were the last step before the broader deal could proceed, LeMond agreed to allow Uphoff to join Roobet on a temporary basis. (*Id*.)

After Uphoff joined Roobet in November 2022, ostensibly as an "independent contractor," he remained involved in Partnership matters. (Compl. ¶34.) However, Uphoff also quietly moved two Partnership domains under his control, and caused LeMond to lose access to his Partnership email. (*Id.*) After LeMond's access was restored, LeMond discovered that the parties' email history, as well as the Partnership's capitalization table, had been deleted. (*Id.*) Meanwhile, unbeknownst to Plaintiffs, Uphoff quietly began building Packdraw for Roobet—a product which bore "inescapable" resemblance to the Partnership's flagship product, Prize, with additional elements taken from TokenWars and

Packs.com. (Compl. ¶¶35-37.) Shortly thereafter, Defendants launched a directly competitive venture, Packdraw, using design files, source code, and other work product that had been developed by the Partnership. (Compl. ¶37.)

When LeMond asked about progress toward the Partnership's deal with Roobet, Uphoff said there had not been any. (Compl. ¶37.) Uphoff later claimed that Duea had instructed him to keep LeMond away from Packdraw. (*Id.*) Having exploited partnership property for their own benefit, Defendants, through Packdraw, generated more than $259 million in user deposits, while Plaintiffs received nothing. (Compl. ¶43.)

## LEGAL STANDARD

To survive dismissal at the pleadings stage, a complaint need only plead enough facts to permit a reasonable inference of liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept well-pleaded factual allegations as true and draw reasonable inferences in Plaintiffs' favor. *Braden*, 588 F.3d at 594. This same standard governs a motion under Rule 12(c). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

Thus, it is reversible error to "ignor[e] reasonable inferences supported by the facts alleged" or, worse, to "draw inferences in [Defendants'] favor." *Braden*, 588 F.3d at 595. Moreover, the Complaint must be read "as a whole," not parsed allegation-by-allegation to test whether each one independently proves Plaintiffs' claims. *Id.* at 594. The Court's task here is limited only to assessing plausibility, not to resolving factual contests or crediting potential defenses. *Id.*

Moreover, the Eighth Circuit has expressly held that "allegations pled on information and belief are not categorically insufficient to state a claim for relief" where proof

is within the defendant's control or the belief is grounded in factual material, making the inference of culpability plausible. *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 953 (8th Cir. 2023). Here, the Complaint alleges on information and belief that Uphoff used Partnership code to develop Packdraw for Roobet. (Compl. ¶41.) At Rule 12, Plaintiffs are not required to prove the internal mechanics of that code use before discovery.

These allegations also find direct support in Defendants' own pleadings. In their joint state-court Answer (Doc. 1-2) (the "Answer"), Defendants Uphoff, Duea, and Packdraw US, LLC admit—among other things—that Uphoff "developed software and blockchain code" (Answer ¶23); that Uphoff developed the specific Partnership projects "including unicorn.pizza, crash.xyz, The House, WowDAO, Packs.com, Token Wars and Prize," (Answer ¶25); that Uphoff "provided services to Raw Entertainment BV in around 2022-2023," (Answer ¶34); that "Packdraw launched in August 2023," (Answer ¶37); and that Raw Entertainment Ltd. "is a wholly owned subsidiary of Raw Entertainment B.V." and "acts as a paying and operational agent" of Roobet, (Answer ¶15). Because Defendants have moved under Rule 12(c) as well as Rule 12(b)(6), these admissions in the pleadings are properly before the Court. Fed. R. Civ. P. 12(c); *Ashley Cnty.*, 552 F.3d at 665.

## **ARGUMENT**

Read as a whole, the Complaint plausibly alleges five sets of claims that Defendants attack together but that require distinct analysis. Part I addresses Count I (breach of fiduciary duty), which is independently secured by the Minnesota partnership statute's mandatory duties of loyalty and non-competition. Part II addresses Counts II and III (civil conspiracy and aiding and abetting), which require only a plausible inference of concerted

action and substantial assistance by Duea and the Roobet defendants. Part III addresses Counts IV and V (trade-secret misappropriation under MUTSA and the DTSA), which require only general identification of the protected information at the pleading stage, not evidentiary detail. Part IV addresses Count VI (unjust enrichment), which may be pleaded in the alternative and reaches conduct extending beyond any purely statutory trade-secret theory. Part V addresses Defendants' Exhibit A and entity-specific attacks, neither of which warrants dismissal on this record.

## I. THE COMPLAINT PLAUSIBLY ALLEGES THAT UPHOFF BREACHED FIDUCIARY DUTIES OWED TO THE PARTNERSHIP AND TO LEMOND.

As a threshold matter, the existence of a partnership between Defendant Uphoff and Plaintiff LeMond is not in dispute at this stage. Defendants expressly "accept the allegation" that LeMond and Uphoff formed a partnership "as true for purposes of this Motion." (Defs.' Mem. at 2 n.1.) That acceptance is determinative on this motion: because the partnership's existence is accepted, the statutory fiduciary duties that attach to partners under Minnesota law apply without question. *See* Minn. Stat. § 323A.0404(b).

Even without that concession, the Complaint more than adequately pleads partnership formation. Under the Minnesota Uniform Partnership Act, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Minn. Stat. § 323A.0202(a). No written agreement is required; a partnership agreement may be "written, oral, or implied." Minn. Stat. § 323A.0101(9). The Complaint alleges that LeMond and Uphoff agreed to start a business venture together. (Compl. ¶22.) They divided responsibilities between design and

technical development. (Compl. ¶23.) They jointly raised approximately $842,000 from investors. (Compl. ¶24.) And they used shared pitch materials listing LeMond as CEO and Uphoff as CTO. (*Id.*) Those allegations describe precisely the kind of co-ownership of a business for profit that § 323A.0202(a) reaches.

Under Minnesota law, each partner must account to the partnership for any property, profit, or benefit derived from partnership business or from use of partnership property, including the appropriation of a partnership opportunity, and must refrain from competing with the partnership before dissolution. Minn. Stat. § 323A.0404(b)(1), (3). The statutory duties are mandatory; partners cannot "destroy the fiduciary character" of their relationship by agreement. *Appletree Square I Ltd. P'ship v. Investmark, Inc.*, 494 N.W.2d 889, 893 (Minn. Ct. App. 1993); *Triple Five of Minn., Inc. v. Simon*, 404 F.3d 1088, 1098 (8th Cir. 2005) (affirming that "Minnesota partnership law prevents partners from contracting away their fiduciary obligations").

### A. Uphoff Violated the Statutory Duty Not to Compete.

The duty not to compete under § 323A.0404(b)(3) is categorical while the partnership persists and terminates only upon dissociation. Minn. Stat. § 323A.0603(b); *see also* Minn. Stat. § 323A.0802 (partnership continues after dissociation for purposes of winding up). The Complaint does not allege that dissolution, dissociation, or winding up occurred before Uphoff built Packdraw, and the Court may not draw any such inference in Defendants' favor. Nor does Uphoff's own pleading in the consolidated related action (No. 25-cv-04128) identify any specific date of dissociation or dissolution. Uphoff admits that he and LeMond "collaborated to develop games for publication on the internet" and states only

that he at some unspecified point "ceas[ed] to collaborate with LeMond," providing no date or circumstances. (Case No. 25-cv-04128, Doc. 1, Uphoff Compl. at ¶¶13, 25.) That admission of prior collaboration, coupled with conspicuous silence on when it ended, confirms that no dissociation appears in any pleading before the Court.

A partner who builds a product directly competitive with the partnership's flagship product while still in the partnership violates § 323A.0404(b)(3), which states that a partner must "refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." Minn. Stat. § 323A.0404(b)(3). The motion's suggestion that more must be shown ignores the plain language of Minnesota's partnership statute.

**B. Uphoff Diverted a Partnership Opportunity.**

The Complaint plausibly alleges both diversion of a partnership opportunity and use of partnership property. Roobet pursued the Partnership because it wanted the Partnership's game concepts, design work, software code, and technical skill, the parties negotiated toward a joint venture centered on Prize and the development of additional game products, and Duea allegedly represented that Uphoff's temporary role as a contractor helping with discrete infrastructure issues was the last step before that deal could move forward. (Compl. ¶¶32-33.) Instead, within months, Uphoff allegedly built Packdraw for Roobet, using assets imported from the Partnership's 'Final Wowdao' Figma design file and likely Partnership code, while Packdraw competed directly with Prize. (Compl. ¶¶34-37.)

On those allegations, the very value Roobet sought from the Partnership became the value Roobet obtained through Uphoff alone. That is a plausible usurpation claim under

§ 323A.0404(b)(1). The Eighth Circuit has applied analogous usurpation principles to Minnesota partnership opportunities in *Triple Five*, 404 F.3d at 1094-96. *Triple Five* further held that a partner cannot divert partnership resources to obtain a partnership opportunity "through use of an alter ego." *Id.* at 1097. Minnesota courts have long recognized the same principle across fiduciary contexts — a fiduciary may not exploit a business opportunity closely connected to the venture's existing line of business. *See, e.g., Miller v. Miller*, 222 N.W.2d 71 (Minn. 1974) (corporate context); *In re Villa Maria, Inc.*, 312 N.W.2d 921 (Minn. 1981) (same).

**C. Uphoff Used Partnership Property for Personal Benefit.**

Separately, the Complaint's allegations also state a claim under the accounting prong of the duty of loyalty, § 323A.0404(b)(1). That provision requires a partner to "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property." Minn. Stat. § 323A.0404(b)(1). The Complaint alleges that Uphoff derived profits from Packdraw—a product built on behalf of the Partnership, using Partnership resources, and sold to the very buyer that the Partnership had been negotiating with—*while he was still a partner in the Partnership*. (*See* Compl. ¶¶32-37.) Whether characterized as an opportunity claim or an accounting claim, the statutory text reaches the conduct alleged.

Defendants refer throughout the Motion to a copyright/work-for-hire theme, arguing that Uphoff "is the only person in the Partnership alleged to have developed any software code" and that the Partnership cannot own copyrightable work product absent assignment

or work-for-hire status. (Defs.' Mem. at 8-9.) Defendants borrow that argument from their separately-filed Motion to Dismiss Counterclaims in consolidated Case No. 0:25-cv-04128. The cross-reference does not advance the instant Motion. Rule 12 evaluates the pleaded Complaint on its own terms; it does not import arguments from a different motion directed at a different pleading.

Defendants' copyright premise also quietly assumes that Uphoff holds sole authorship of the Partnership's work product. That assumption is contestable on the face of the Complaint. LeMond and Uphoff divided labor on a unified venture — LeMond "responsible for visual and experiential design," Uphoff responsible for "technical models, software and blockchain code" — and together "jointly developed a series of products" including Prize, TokenWars, and Packs.com. (Compl. ¶¶23, 25.) On those allegations, the Partnership's work product plausibly includes joint works as defined by 17 U.S.C. § 101: "work[s] prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." Joint authors, like partners, hold undivided interests in the joint work. *See, e.g., Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir. 1991). Regardless of copyright title, Uphoff's statutory accounting duty under Minn. Stat. § 323A.0404(b)(1) independently reaches any profit or benefit he derived from the Partnership's work product. Whether Uphoff holds sole, partial, or joint authorship of any particular element of the pleaded work product is a factual question that cannot be resolved against Plaintiffs on the pleadings — and one that is unnecessary to reach because the fiduciary-duty analysis is independent of copyright title in any event.

More fundamentally, Defendants conflate copyright ownership with fiduciary duty. Plaintiffs have not pleaded copyright infringement. They have pleaded that Uphoff — while still a partner — derived personal benefit from the conduct of partnership business and from the use of partnership property, and appropriated a partnership opportunity. (Compl. ¶¶32-43.) Section 323A.0404(b)(1) requires Uphoff "to account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property." Minn. Stat. § 323A.0404(b)(1). That duty is independent of — and indifferent to — who holds formal copyright title. A partner who uses partnership property to generate personal benefit owes an accounting, full stop, whether the underlying property is a tangible asset, a trade secret, a design file, or a copyrightable work to which the partner himself claims authorship.

Minnesota partnership law reinforces the point. Property acquired in the name of, or with the credit of, the partnership — or used in the conduct of partnership business — is partnership property regardless of individual authorship claims. *See* Minn. Stat. § 323A.0204. And even if discovery ultimately shows that Uphoff authored particular software code, he cannot shield from statutory fiduciary duties the value he extracted from using that code — developed for the Partnership, within the Partnership, and with partnership resources — to build a directly competitive product for Roobet. The fiduciary-duty claim survives at the pleading stage on the face of the statute.

Whether a fiduciary duty was breached is "generally a question of fact." *Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 369 (Minn. Ct. App. 2000). The same is true of the

opportunity-diversion inquiry specifically: the Minnesota Supreme Court has recognized that "ordinarily whether an acquisition is a corporate opportunity is a question of fact" requiring examination of multiple circumstances. *PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1, 8 (Minn. 1990). The motion's attempt to resolve that question at the pleading stage is therefore premature.

### D. Uphoff Concealed His Conduct in Breach of Fiduciary Disclosure Duties.

The Complaint also alleges a separate and independently significant loyalty breach through concealment. (Compl. ¶42.) Uphoff took control of Partnership domains, cut off LeMond's access to his Partnership email, deleted email history and the capitalization table, failed to disclose that his Roobet work had shifted to building Packdraw, told LeMond there had been no progress on the Roobet deal, and later said Duea had instructed him to keep LeMond away from Packdraw. (Compl. ¶¶34-36.) Minnesota law recognizes broad fiduciary disclosure obligations among partners: "where a fiduciary relationship exists, silence may constitute fraud." *Appletree Square I*, 494 N.W.2d at 893; *see also Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 622 (Minn. 1972) (one who stands in a fiduciary relation must disclose material facts).

The Eighth Circuit has confirmed that concealment and usurpation are intertwined where one fiduciary uses subterfuge to prevent the venture or the other partner from participating in an opportunity. *Triple Five*, 404 F.3d at 1094–96. And concealment, deceit, and self-dealing by a fiduciary are independently actionable breaches. *Appletree Square I*, 494 N.W.2d at 892–94 (reversing summary judgment and holding that partners owe an

affirmative duty of disclosure and that "silence may constitute fraud" in a fiduciary relationship); *Triple Five*, 404 F.3d at 1095 (affirming finding of fiduciary breach where partner concealed negotiations from co-partner and usurped partnership opportunity). At the pleading stage, these allegations support concealed self-dealing and subterfuge, not mere competition.

*Rensch v. Reger*, No. 10-cv-03679 (SRN/JJK), 2011 WL 13233340, at *5 (D. Minn. June 20, 2011), relied upon by Defendants, does not change the result. Defendants quote *Rensch* for the unremarkable point that establishing an additional related business is not automatically wrongful. (Defs.' Mem. at 10.) *Rensch*, however, cuts against — not for — Defendants here.

*Rensch* was a shareholder's derivative action governed by corporate-law usurpation principles, not a partnership case governed by the Minnesota Uniform Partnership Act's mandatory statutory duties. *See* Minn. Stat. § 323A.0404(b)(1), (3). More importantly, *Rensch* articulates the very test that this Complaint satisfies. The *Rensch* court expressly held that "the mere creation of separate businesses by corporate officers and directors does not necessarily support a claim for usurpation," because "[l]iability depends on the competitor being in the same line of business, and the wrongful diversion of business to the competitor." *Rensch*, 2011 WL 13233340, at *6. The court dismissed because the plaintiff there alleged nothing more than the creation of potentially competing entities — no specific diverted opportunity, no allegation of who actually created the allegedly-usurping entity, and no pleaded wrongful diversion of business. *See id.* at *5-7.

Other courts have distinguished *Rensch* on materially similar facts. In *4Brava, LLC v. Sachs*, No. 15-2744 (JRT/DTS), 2017 WL 1194195, at *14 n.9 (D. Minn. Mar. 30, 2017), Chief Judge Tunheim rejected the defendants' reliance on *Rensch* precisely because the *Rensch* plaintiffs had alleged only "the creation of 'entities that at most could potentially usurp an opportunity,'" while the *4Brava* defendants had "in fact funneled profits from an opportunity" belonging to the venture. The court found fiduciary breach and usurpation on those facts, entering summary judgment for the plaintiff. *See id.* at *14-15. The same distinguishing facts are present here.

This Complaint alleges precisely what *Rensch* required and found absent: a narrow scope of consent induced by a specific representation about temporary infrastructure work, a concealed pivot from that narrow role to product development, use of identified Partnership materials — including the 'Final Wowdao' Figma file imported on March 16, 2023 into Packdraw — direct competition with the Partnership's flagship product, and affirmative concealment that prevented LeMond from protecting the venture's interests. (*See generally* Compl.) Packdraw is not a parallel business established alongside the Partnership; it is a product allegedly built with Partnership assets for the very counterparty negotiating to fund the Partnership's joint venture. Fiduciaries in closely held ventures owe "the highest standard of integrity" and must deal "openly, honestly and fairly." *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn. Ct. App. 1984). What is alleged here is the antithesis of that standard.

The Motion also argues that LeMond "consent[ed]" to Uphoff's work at Roobet. (Defs.' Mem. at 10.) But the Complaint makes clear that this alleged consent was limited

to temporary infrastructure work and was induced by Duea's representation that such work was a prerequisite to the broader deal proceeding. (Compl. ¶33.) A narrowly scoped consent induced by a specific misrepresentation cannot be recharacterized as blanket authorization to build a directly competitive product, divert partnership materials, and conceal the entire endeavor. The Eighth Circuit recognized in *Triple Five* that a fiduciary who conceals material facts from a partner cannot later claim the partner's acquiescence as a defense; concealment and usurpation are intertwined where one fiduciary uses subterfuge to prevent the other from protecting the venture's interests. 404 F.3d at 1094–96.

Here, Uphoff allegedly concealed his pivot from infrastructure work to competitive product development, making any claimed consent uninformed and therefore no defense to a fiduciary-duty claim. *Cf. id.* ("Minnesota partnership law prevents partners from contracting away their fiduciary obligations"); *see also Absolute Sports Cards, LLC v. Thornton*, No. A24-0215, 2024 WL 4260268, at *3 (Minn. Ct. App. Sept. 23, 2024) (voiding as "manifestly unreasonable" under Minn. Stat. § 322C.0110, subd. 4(1)(iii), a provision purporting to permit a member's competition with a closely held LLC; reinforcing Minnesota's hostility to contractual carveouts from the duty of loyalty in closely held entities). At minimum, the scope of any consent is a factual question that cannot be resolved on a motion to dismiss. *See Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 367 (Minn. Ct. App. 2000) ("Whether a fiduciary duty has been breached generally is a question of fact."); *PJ Acquisition*, 453 N.W.2d at 8 (corporate opportunity determinations are fact-intensive and ordinarily reserved for trial).

## II. THE COMPLAINT PLAUSIBLY ALLEGES CIVIL CONSPIRACY AND AIDING AND ABETTING AS TO DUEA AND THE ROOBET DEFENDANTS.

Civil conspiracy and aiding and abetting are distinct theories, and the Complaint plausibly alleges both.

### A. Civil Conspiracy.

The same sequence that supports the fiduciary-duty claim — Roobet's narrow-infrastructure representation, Uphoff's pivot to Packdraw, and the concealed exclusion of LeMond — also supports an inference of concerted action. Civil conspiracy requires a plausible agreement and concerted action toward an unlawful objective. *See Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 825 (Minn. 1950). Breach of fiduciary duty is an intentional tort sufficient to serve as the predicate for a conspiracy claim. *See D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997). Moreover, "[t]he combination need not be established by direct proof. No formal agreement to commit the acts charged need be shown. The existence of the combination or conspiracy may be inferred from other facts proved." *Nathan v. St. Paul Mut. Ins. Co.*, 86 N.W.2d 503, 509 (Minn. 1957).

Here, the Complaint alleges a coherent sequence of concerted acts: Duea negotiated for months for the Partnership's assets; represented that the broader deal was close; obtained direct private access to Uphoff after LeMond had been the principal point of contact; represented that Uphoff's Roobet role would be temporary infrastructure work; instructed Uphoff to keep LeMond away from Packdraw; and supervised Uphoff while Packdraw was built. (Compl. ¶¶32-37.)

Plaintiffs need not plead an express oral agreement *in haec verba*. At the pleading stage, an agreement may be inferred from coordinated conduct that makes little sense as innocent coincidence. *See Nathan*, 86 N.W.2d at 509 ("Conspirators do not make minutes of their machinations, progress and objectives. Seldom, therefore, can conspiracy be proved by other than circumstantial evidence."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[A]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). The alleged sequence here—months of negotiations, followed by Duea's maneuver to separate Uphoff from LeMond, followed by concerted development of a directly competitive product built on Partnership work product, followed by an affirmative instruction to conceal the project from LeMond—supports precisely that inference.

Defendants cite *Tatone v. SunTrust Mortgage, Inc.*, 857 F. Supp. 2d 821, 838–39 (D. Minn. 2012), but *Tatone* involved a consumer mortgage dispute in which the plaintiff alleged no facts beyond formulaic labels of 'conspiracy' and 'agreement.' *Id.* That is not this case. The Complaint here alleges a detailed factual sequence: months of negotiations, an evolving strategy by Duea to separate Uphoff from LeMond, a false justification for bringing Uphoff inside Roobet, supervision of the development of a directly competitive product, and an affirmative instruction to conceal the project from LeMond. (*See* Compl.) Taken together, those alleged facts are a plausible basis from which to infer a meeting of the minds—exactly the kind of circumstantial inference that *Nathan* expressly endorses. 86 N.W.2d at 509; *see also Twombly*, 550 U.S. at 546.

**B. Aiding and Abetting.**

Aiding and abetting requires (1) a primary breach of duty, (2) knowledge of the breach, and (3) substantial assistance or encouragement. *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187–88 (Minn. 1999). Critically, the Minnesota Supreme Court held in *Witzman* that knowledge and substantial assistance are evaluated "in tandem": "where there is a minimal showing of substantial assistance, a greater showing of scienter is required," and *vice versa*. *Id.* at 188. This inverse relationship is dispositive here because the alleged assistance is far from minimal.

The motion correctly notes that actual knowledge matters. But the Complaint pleads far more than 'red flags.' Duea allegedly knew LeMond and Uphoff were co-founders, knew Uphoff was the Partnership's CTO, knew outside money had been raised, knew Roobet wanted the Partnership's concepts, design, code, and technical skill, and then supervised the very work through which Packdraw allegedly replaced the contemplated joint venture. (Compl. ¶¶26-37.) If those allegations are true, Duea was not a remote professional adviser who merely observed suspicious circumstances; he was the negotiator, access-broker, supervisor, and concealment participant. Indeed, Duea spent over a year negotiating specifically for the Partnership's game concepts, design, software code, and technical skill—the very assets that Uphoff then allegedly brought inside Roobet to build Packdraw. (Compl. ¶¶27-34.)

Under these circumstances, a factfinder could readily infer that Duea knew exactly what Uphoff was using and where it came from. This conclusion is reinforced by *Witzman*'s recognition that, where a primary tortfeasor's conduct is "clearly tortious or illegal,"

a defendant with a "long-term or in-depth relationship with that tortfeasor may be deemed to have constructive knowledge that the conduct was indeed tortious." 601 N.W.2d at 188. Duea's year-plus negotiation with Uphoff over the Partnership's game concepts, design, code, and technical skill is precisely such a long-term, in-depth relationship — it independently supports the knowledge element on a constructive-knowledge theory. The *Witzman* tandem test is satisfied because both the knowledge showing and the assistance showing are substantial.

Defendants' reliance on *Varga v. U.S. Bank National Ass'n*, 764 F.3d 833 (8th Cir. 2014), underscores rather than undermines Plaintiffs' position. *Varga* affirmed dismissal where a bank provided routine financial services without alleged direct knowledge of wrongdoing—an arm's-length banking relationship. *Id.* at 843. That is not this case. The Complaint here alleges that Roobet actively solicited and received misappropriated partnership work product, hired the breaching partner, deployed the allegedly diverted materials to build a commercial product, and instructed the breaching partner to keep the other partner away. (Compl. ¶¶26-37.) Under the *Witzman* tandem analysis, the uniquely substantial nature of the alleged assistance requires a correspondingly lower scienter showing.

Defendants' reliance on *Kamal v. Baker Tilly US, LLP*, No. CV 21-1549, 2022 WL 1050053, at *10 (D. Minn. Apr. 7, 2022), is also misplaced. In *Kamal*, the court dismissed aiding and abetting claims against an accounting firm that provided standard professional services—routine audit work—without any facts suggesting the firm actually knew its client was breaching fiduciary duties. *Id.* at *9-10. Here, by contrast, the Complaint does not allege that Roobet or Duea were merely providing arms'-length professional services. They

were the direct beneficiaries of Uphoff's breach, actively orchestrating the circumstances that made it possible and concealing the result. (Compl. ¶¶26-37.)

Substantial assistance is also plausibly alleged. The Complaint alleges that Roobet brought Uphoff inside, employed him while the challenged conduct occurred, provided the commercial platform on which Packdraw was developed and launched, and benefitted from the allegedly diverted work. (*Id.*) When coupled with the allegation that Duea told Uphoff to keep LeMond away from Packdraw, those are not passive or incidental acts. They are affirmative forms of assistance to the alleged breach. *See R.J. Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 720 (8th Cir. 2019) (acknowledging that substantial assistance requires conduct beyond routine services). Defendants themselves admit that Uphoff "provided services to Raw Entertainment BV in around 2022-2023" (Answer ¶34)—squarely within the alleged breach window and consistent with the Complaint's allegations of Roobet's substantial assistance.

Brennan and Temiz are less central, but the allegations as to them still survive Rule 12. That Brennan and Temiz occupy a narrower role than Duea is no basis for dismissal: Rule 12 asks whether the Complaint states a plausible claim against each defendant on the counts actually asserted, not whether some defendants occupy a more central role than others. Brennan participated in 2021 negotiations around Packs.com and received design materials from LeMond in that context. Temiz communicated to LeMond that the deal was close at hand. The Complaint further alleges that Brennan and Temiz directed, supported, or assisted Uphoff in taking design elements from Prize, TokenWars, and Packs.com to develop Packdraw. (Compl. ¶¶5, 32-37.) Discovery may show that the evidence against

Duea is stronger than the evidence against those two executives, but dismissal is not warranted where the Complaint alleges their participation in the negotiation-to-diversion sequence, their support for the resulting project, and their enjoyment of the benefits of Uphoff's breach.

Taken together, the authorities Defendants cite share a common feature that this case lacks: they involved arms-length intermediaries — a bank providing routine loan services (*Varga*), an accounting firm providing standard audit work (*Kamal*) — who had no direct stake in the underlying breach. The Complaint here alleges the opposite: Duea and the Roobet defendants were not passive service providers to Uphoff's breach. They were the architects and principal beneficiaries of it, having negotiated directly for the Partnership's assets, orchestrated Uphoff's placement inside Roobet, supervised the development of Packdraw, instructed concealment from LeMond, and retained the resulting commercial product. (Compl. ¶¶26-37, 42-43.) The *Witzman* tandem analysis maps directly onto this factual posture: substantial alleged assistance plus the principal-beneficiary posture together establish the requisite scienter at the pleading stage.

*Triple Five* further confirms that the Eighth Circuit does not categorically shield third-party entities from liability for a partner's fiduciary breach where relationships are "intertwined enough" — there, the court held that a non-partner entity was liable where its officers used information gained in their capacities as partner-entity directors to profit individually through the non-partner entity. 404 F.3d at 1096. Whatever the precise label — aiding-abetting, conspiracy, or intertwined-entity liability — the pleaded facts here plausibly reach Duea, Roobet, and the Packdraw entities.

## III. THE COMPLAINT PLAUSIBLY ALLEGES TRADE SECRET MISAPPROPRIATION.

Defendants' trade-secret arguments again conflate pleading with proof. The question is not whether Plaintiffs have already proven every trade-secret element; it is whether the Complaint plausibly alleges nonpublic, economically valuable information and plausible misuse. It does.

### A. The Trade Secrets Are Adequately Identified.

At the pleading stage, a trade-secret plaintiff identifies the protected information sufficiently when the Complaint enables the defendant to understand what is alleged to be protected and the court to evaluate plausibility. The Eighth Circuit confirmed this in *Ahern Rentals*, 59 F.4th at 955, which reversed dismissal of DTSA claims where the protected information was identified by general categories — there, "customer lists, rental information, pricing information, and marketing strategies." The court also endorsed information-and-belief pleading, citing Fed. R. Civ. P. 11(b)(3)'s allowance of factual contentions that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* at 953. *Ahern Rentals* is the controlling Eighth Circuit authority on trade-secret identification at the pleading stage.

The Complaint identifies the protected information, not as a loose catalogue of categories, but as a single nonpublic compilation: the integrated body of design, game-mechanic, economic-model, user-interface, software, system-architecture, competitor-research, and blockchain-code work developed within a closely held pre-launch venture for three specific products — Prize, TokenWars, and Packs.com — and stored in specific

private repositories, including the Partnership's 'Final Wowdao' Figma file and code repositories used for Partnership development. (Compl. ¶¶23, 25, 34-41.) MUTSA expressly protects such compilations. Minn. Stat. § 325C.01, subd. 5. The compilation derives independent economic value precisely from its integration: the combination of design, mechanics, architecture, and code, developed together for unreleased products by the same small team, is the asset that Defendants allegedly misappropriated to build Packdraw. Defendants' own Answer confirms the specificity of this identification: they admit that Uphoff "developed games of chance under various project names including unicorn.pizza, crash.xyz, The House, WowDAO, Packs.com, Token Wars and Prize," along with underlying "software and blockchain code." (Answer ¶¶23, 25.) Uphoff's own pleading in the consolidated related action goes further, acknowledging that "Packs Client" is "also known as WowDao, Packs.com, and Prize.xyz" and confirming that "WowDao Protocol is derivative of Packs Protocol"—admissions that the specific products Plaintiffs identify are interrelated components of a single developmental compilation. (Uphoff Compl., No. 25-cv-04128, Doc. 1 ¶14(a), (c).)

That framing is critical because it tethers every element of the trade-secret analysis to identifiable objects. *Identification:* the compilation exists in identifiable internal repositories tied to identifiable products. *Secrecy:* the repositories were internal to a closely held pre-launch venture, and access was limited to Partnership personnel and specific deal counterparties. *Misappropriation:* a specific import event on March 16, 2023 transferred identifiable assets from the Partnership's 'Final Wowdao' file into Packdraw's own Figma file. (Compl. ¶40.)

On that framing, Defendants' "generic categories" attack misapprehends the pleaded theory. Defendants treat each category on Plaintiffs' list as if it stood alone and then argue each is too broad. But the Complaint does not plead each category as a separate trade secret. It pleads them as components of a single integrated compilation tied to specific products and specific repositories — exactly the kind of pleading that *Ahern Rentals* approved. 59 F.4th at 955.

This District has repeatedly confirmed that trade secrets need not be identified with granular specificity at the pleading stage. In *Orbital Eng'g, Inc. v. Short Elliott Hendrickson, Inc.*, No. 25-cv-02121, 2025 WL 3251425, at *3 (D. Minn. Nov. 21, 2025), the court held explicitly that "trade secrets need not be identified in detail or specifics to survive a motion to dismiss." *Accord Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 938–41 (D. Minn. 2019) (plaintiff need not "paradoxically jeopardize" its trade secrets by giving everything away at the pleading stage); *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, No. 12-cv-01197, 2013 WL 6827348, at *3-4 (D. Minn. Dec. 23, 2013) (applying relaxed standard because plaintiff is "understandably hesitant" to reveal details that requiring disclosure in a public complaint could destroy); *see also Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*, 149 F.4th 1081, 1085 (9th Cir. 2025) (holding that the DTSA "does not require a plaintiff to identify with particularity its alleged trade secrets from the start").

This case is materially stronger than any case in which dismissal was granted based on generic or conclusory allegations. Here, the Complaint ties the alleged compilation to identifiable products, identifiable internal repositories, and an identifiable act of use — the

March 16, 2023 import from a specific file titled 'Final Wowdao' into Packdraw's own Figma file. (Compl. ¶40.) That kind of tethering exceeds what plausibility requires.

Defendants' copyright/work-for-hire argument fares no better against the trade-secret claim. (Defs.' Mem. at 18.) Whether Uphoff or some other contributor holds copyright authorship of particular design files or code is orthogonal to MUTSA and DTSA trade-secret status. *See* 18 U.S.C. § 1839(3) (trade-secret status turns on secrecy, economic value, and reasonable efforts to maintain secrecy — not on copyright title); Minn. Stat. § 325C.01, subd. 5 (same). A trade secret can belong to an owner who has no copyright title in the underlying expression; conversely, a copyrighted work need not be a trade secret. The pleaded compilation is a Partnership asset because it was developed within the Partnership for unreleased Partnership products and maintained in Partnership repositories — not because any single person claims or disclaims copyright authorship of individual components.

**B. Secrecy Measures Are Adequately Pleaded.**

MUTSA requires efforts reasonable under the circumstances, not perfect formalities. Minn. Stat. § 325C.01, subd. 5; *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005) ("absolute secrecy is not required"). Under the Eighth Circuit's totality-of-the-circumstances test, courts weigh at least six factors when evaluating whether a trade-secret owner's efforts were reasonable under the circumstances: (1) physical security at facilities housing the information; (2) limited access to the confidential information; (3) employee training on confidentiality obligations; (4) document control measures; (5) oral and written understandings of confidentiality; and (6) the absence of repeated losses of confidential

information. *Id.* at 900. Deficiencies in any single measure do not defeat protection if, considered together, the efforts were reasonable. *Id.* at 901. The Complaint alleges a small, pre-launch venture developing unreleased products, with repositories and code controlled internally and disclosures made only in fundraising and deal-negotiation settings tied to possible commercialization. (*See* Compl.) Those allegations plausibly plead reasonable secrecy measures.

Defendants' argument that Plaintiffs failed to allege any secrecy measures ignores both what the Complaint says and the permissive standard at the pleading stage. The Complaint alleges that the information was developed within a small partnership of individuals and corporate investors, stored in internal code repositories to which Uphoff as CTO maintained control, used in products that were never released to the public, and shared only in the context of confidential business negotiations, product development, and fundraising. (Compl. ¶¶22-25, 32-34.) Courts have recognized that in a small pre-launch venture, the very nature of the business—limited personnel, unreleased products, internal-only repositories—can itself constitute a reasonable effort to maintain secrecy. *See Protégé Biomedical*, 394 F. Supp. 3d at 939 (allowing trade-secret claims to proceed where information was shared during acquisition discussions).

This District's most recent authority on closely held-entity secrecy measures reinforces that conclusion. In *Gilk v. Fisher*, No. 25-2158, 2025 WL 1920496 (D. Minn. July 11, 2025) (Tunheim, J.), the court addressed whether members of a closely held LLC had taken reasonable efforts to maintain the secrecy of proprietary product innovations. Applying *Wyeth*'s totality-of-the-circumstances framework, the court held that "[i]t seems

entirely reasonable that in a closely held company with only five members, reliance on only fiduciary duties to preserve confidential information would be reasonable." *Id.* at *5. Although *Gilk* arose on a preliminary-injunction record rather than a motion to dismiss, its reasoning applies with at least equal force at the pleading stage, where Plaintiffs need only plead plausibility. The Partnership here was even smaller than the closely held LLC in *Gilk*, its principals owed mandatory statutory fiduciary duties under Minn. Stat. § 323A.0404(b) that parallel (and in some respects exceed) the Operating-Agreement duties in *Gilk*, and the Partnership's unreleased products were never publicly sold — unlike the F2 Carbon, which *Gilk* nonetheless treated as sufficiently secret.

The *Gilk* court also rejected the same style of attack Defendants make here — that Plaintiffs failed to deploy additional confidentiality measures. As the court put it, "the fact that more could have been done does not mean that the current measures were inadequate." *Id.* Defendants' catalog of measures Plaintiffs allegedly failed to take — NDAs, confidentiality markings, written policies — is no more dispositive here than in *Gilk*.

Defendants' reliance on *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 396–97 (D. Minn. 2020) (Defs.' Mem. at 19), is misplaced for two reasons. First, *Prairie Field Servs.* arose on a preliminary injunction record, not a Rule 12 motion; its analysis of reasonable secrecy measures turned on evidence, not pleading sufficiency. Second, the Motion cites *Prairie Field Servs.* for the proposition that "marking documents as confidential or requiring passwords" is insufficient — a proposition that cuts against Defendants' own position here, because it confirms that secrecy analysis is context-specific and cannot be reduced to the presence or absence of formal confidentiality measures. (*See* Defs.' Mem.

at 19.) The Complaint alleges what matters: a closely held pre-launch venture with internal repositories, unreleased products, and disclosure limited to fundraising and prospective deal counterparties. (Compl. ¶¶22-25, 32-34.) Those allegations, together with the reasonable inferences they support, plead reasonable secrecy measures for Rule 12 purposes.

Further, *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890 (Minn. 1983), does not compel dismissal. *Electro-Craft* rejected trade-secret protection on *a fully developed evidentiary record* that had already *proved* a set of 'fatally lax' confidentiality practices, including unrestricted access and inconsistent treatment of the allegedly secret information. *Id.* at 902. *Aries Information Systems, Inc. v. Pacific Management Systems Corp.*, 366 N.W.2d 366, 368–69 (Minn. Ct. App. 1985), by contrast, upheld trade-secret protection for computer software where the developer used concrete measures to maintain secrecy—specifically, proprietary notices on all source code listings and magnetic tapes, copyrighted user manuals stating that system information was proprietary, proprietary clauses in every client contract, and employee Confidential Information Agreements containing confidentiality acknowledgments, non-disclosure prohibitions, and multi-year non-compete restrictions. This case sits at the pleading stage between those poles. Plaintiffs have adequately pleaded reasonable secrecy measures; whether those measures were sufficient under the totality of the circumstances is itself a question of fact not appropriate for adjudication at the pleadings stage. *See Wyeth*, 395 F.3d at 899.

Nor do the allegations fail merely because some information was selectively disclosed during fundraising or deal discussions. Trade-secret status is not destroyed by limited disclosure for evaluation or commercialization purposes. *Protégé Biomedical*, 394 F.

Supp. 3d at 939 (allowing trade-secret claims to proceed where information was shared during acquisition discussions). Here, the Complaint alleges that the products at issue were unreleased, developed within a small venture, and disclosed only in the course of obtaining investment or pursuing a deal with Roobet itself. (*See* Compl.) That is a plausible secrecy theory, especially before discovery.

Defendants also attempt to wield the Complaint's allegation that "only LeMond and Uphoff [. . .] were aware of the Trade Secrets" against the allegation that others were hired by the Partnership and that certain Packs.com designs were shared with Duea and Brennan during 2021 joint-venture negotiations. (*See* Defs'. Mem. at 19; *compare* Compl. ¶¶62, 72, *with* Compl. ¶¶24-25, 40.) There is no inconsistency. The Complaint alleges that only LeMond and Uphoff were aware of the integrated compilation that constitutes the pleaded trade secret. That others hired by the Partnership may have worked on discrete components of unreleased products, or that discrete design elements were later shared with prospective counterparties under the umbrella of ongoing deal negotiations, does not defeat trade-secret status as to the compilation itself. *See Protégé Biomedical*, 394 F. Supp. 3d at 939. At minimum, whether these disclosures were sufficient to destroy secrecy as to the integrated compilation is a fact question on a record that has not yet been developed. *See Wyeth*, 395 F.3d at 899.

### C. Misappropriation Is Plausibly Alleged.

Before turning to the specific defendants, Defendants' invocation of *Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 702 (Minn. 1982), for the proposition that even an employee must be given "fair notice of the confidential nature of the material to be kept

confidential" (Defs.' Mem. at 21), misreads the case. *Jostens* also supports the very secrecy theory Defendants attack. The same opinion recognized that "secrecy need not be total; depending on the circumstances, only partial or qualified secrecy will do." *Jostens*, 318 N.W.2d at 700. The Supreme Court has likewise held that "secrecy is not lost [. . .] if the holder of the trade secret reveals the trade secret to another in 'confidence, and under an implied obligation not to use or disclose it.'" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974). This District has recently applied that principle to confirm that in a closely held entity, the fiduciary relationship among co-owners can supply precisely such an implied obligation. *See Gilk*, 2025 WL 1920496, at *5. Uphoff — as a partner owing statutory fiduciary duties under § 323A.0404(b) — cannot reasonably claim to lack notice that Partnership work product was to be kept in confidence for Partnership use.

As to Uphoff, the Complaint alleges that he had access to the materials as the Partnership's CTO and then used them to build Packdraw for Roobet. (Compl. ¶¶22-24, 33-36, 39-41.) The Complaint does not ask the Court to infer misappropriation from similarity alone. It alleges similarity plus access, a specific import event, likely code use from a repository he controlled, a motive to bypass the Partnership, and concealment of the resulting project. Courts in the Eighth Circuit have held that the combination of access and similarity, when coupled with circumstantial evidence of use, is sufficient to create a plausible inference of misappropriation. *See Wyeth*, 395 F.3d at 900–02 (suspicious circumstances and the emergence of a similar product can support an inference of misappropriation).

As to the other defendants, MUTSA and DTSA require only that a defendant knew or had reason to know the information was acquired or used through improper means or

through a person who owed a duty of secrecy or limited use. Minn. Stat. § 325C.01, subd. 3; 18 U.S.C. § 1839(5). That standard is importantly different from the actual-knowledge requirement for aiding and abetting. The Complaint alleges prior negotiations over the same products and know-how, direct involvement by Duea, Brennan, and Temiz, a product inescapably similar to Prize, the March 2023 import, and concealment of Packdraw from Plaintiffs LeMond and Capture. (Compl. ¶¶5, 27-41.) Under *Wyeth*, suspicious circumstances and the emergence of a similar product can support an inference of misappropriation. 395 F.3d at 900–02. The allegations here include not just suspicious circumstances, but a pleaded act of direct import.

The Eighth Circuit's holding in *Ahern Rentals* reinforces this point. There, the court reversed dismissal even though the defendant's knowledge was alleged only on information and belief, because factual allegations about the intertwined business relationship made the inference of knowledge plausible. 59 F.4th at 955. The same logic applies here: Roobet and Packdraw's alleged operational intertwining, their prior negotiations for the very assets at issue, and their supervision of Uphoff's work make it plausible that they knew or had reason to know the information was improperly obtained. (Compl. ¶¶27-41.)

Nor can Uphoff plausibly contest that use occurred: he himself is the plaintiff in a parallel declaratory-judgment action concerning the copyrighted code in the same products—"Packs Client" (identified in his own pleading as "also known as WowDao, Packs.com, and Prize.xyz"), "Packs Protocol," "WowDao Protocol," and "Token Wars." (No. 25-cv-04128, Uphoff Compl. at ¶14(a)-(d).) That action, now consolidated with this case, cannot proceed without an Article III case or controversy over use—an abstract

ownership question, untethered to any actual or imminent use, would be unripe. Uphoff's own pleading in the declaratory-judgment action thereby confirms the identity and continuing legal significance of the same product/code families at issue here, reinforcing the plausibility of Plaintiffs' allegation that those assets were being used and exploited in a concrete commercial dispute.

If the Court concludes that any aspect of the trade-secret claim — whether the identification of the compilation, the particulars of secrecy measures, or the entity-specific misappropriation allegations — would benefit from greater factual detail, the appropriate remedy under Rule 15(a) is leave to amend. Rule 12 dismissal with prejudice is disfavored where specific pleading gaps can readily be cured, and Plaintiffs can supply additional factual detail about the repositories, access controls, and specific misappropriated elements without disclosing the compilation itself in a public filing. *See Protégé Biomedical*, 394 F. Supp. 3d at 939. Plaintiffs respectfully request leave to amend in preference to dismissal with prejudice of any trade-secret allegation the Court finds insufficiently detailed.

## IV. THE UNJUST-ENRICHMENT CLAIM SHOULD NOT BE DISMISSED IN FULL AT THE PLEADING STAGE.

Defendants overread both Minnesota equity law and MUTSA displacement. Plaintiffs may plead unjust enrichment in the alternative, and the claim need not be dismissed in full so long as it rests in part on conduct not wholly duplicative of trade-secret misappropriation. *See* Fed. R. Civ. P. 8(d)(2)–(3); *Protégé*, 394 F. Supp. 3d at 940–41.

Specifically, the Complaint pleads at least four non-duplicative bases for unjust enrichment: (1) diversion of the Partnership's Roobet opportunity into a product developed

for Roobet's own benefit; (2) broader use of partnership work product — including design, game-mechanic, economic-model, and software work — not limited to any specific trade-secret allegation; (3) Packdraw monetization and retention of resulting benefits; and (4) post-breach retention and exploitation by Packdraw Limited, Packdraw US, LLC, and PDCC — entities that, by their own account, were formed only after the alleged breach but continue to hold, operate, and benefit from the resulting product. Each basis reaches conduct not wholly duplicative of MUTSA/DTSA misappropriation.

MUTSA's displacement provision, Minn. Stat. § 325C.07(a), only displaces claims whose factual allegations involve nothing "more" than "the mere misuse or misappropriation of trade secrets." *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179 (D. Minn. 2003) (quoting *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988)). "To the extent a cause of action exists in the commercial area not dependent on trade secrets, that cause continues to exist." *Micro Display*, 699 F. Supp. at 205. Although *SL Montevideo* ultimately dismissed tortious-interference and conversion claims as wholly duplicative of a trade-secret theory, the court in that case took care to preserve parallel claims that alleged "more" than mere misappropriation—which is precisely the posture here. 292 F. Supp. 2d at 1179. The Complaint alleges not only misuse of confidential information, but also diversion of a partnership opportunity, use of partnership property more broadly, and retention of benefits generated by Packdraw while Plaintiffs allegedly received nothing. (Compl. ¶¶34-43.) Those theories are not limited to whether the information at issue ultimately qualifies as a trade secret.

Courts in this District have confirmed that MUTSA displacement is premature at the pleading stage. In *Schwan's Co. v. Cai*, No. 20-2157 (JRT/HB), 2021 WL 5745791, at *9 (D. Minn. Dec. 2, 2021), the court denied dismissal of an unjust enrichment claim, holding "it is plausible that [the defendant] was unjustly enriched by something that is not covered by DTSA or MUTSA allowing this claim to survive for now." And in *Polaris Industries, Inc. v. Mangum*, 690 F. Supp. 3d 966, 972-75 (D. Minn. 2023), the court denied a Rule 12 motion seeking to dismiss unjust enrichment and related claims on MUTSA displacement grounds, applying the "more than misappropriation" principle and recognizing alternative pleading while the trade-secret characterization remained to be litigated. The same result should obtain here.

Defendants' citation to *Ahlgren v. Capital One Bank*, No. 19-cv-1607, 2020 WL 618236 (D. Minn. Feb. 10, 2020), does not help them. (Defs.' Mem. at 26.) In *Ahlgren*, the unjust-enrichment claim duplicated statutory avoidance claims directed to the same transfers and the same pleaded facts. *Ahlgren*, 2020 WL 618236, at *5. The same is not true here, where Plaintiffs plead unjust enrichment as an alternative theory tied to diverted opportunity, broader use of partnership property, and Packdraw monetization—conduct that extends well beyond any statutory trade-secret claim. (*See* Compl.)

The Minnesota Supreme Court's most recent unjust-enrichment guidance reinforces the viability of this claim. In *Hepfl v. Meadowcroft*, 9 N.W.3d 567, 573-74 (Minn. 2024), the Court rejected an unduly cramped formulation of the unjust-enrichment standard and emphasized that the inquiry focuses on whether the defendant's retention of the benefit would be unjust or inequitable under the circumstances. *Hepfl* went further and held that

"a plaintiff may succeed in showing that the enrichment was unjust in the absence of any improper conduct at all by the unjustly enriched party." *Id.* at 573. That holding has particular force here as to the downstream Packdraw, Packdraw US, and PDCC Services entities: even assuming they were not themselves active participants in Uphoff's underlying fiduciary breach, *Hepfl* confirms that the inequitable retention of benefits conferred — here, the value of diverted Partnership work product — is itself actionable in unjust enrichment. That equitable standard is satisfied here, where Defendants allegedly retained substantial benefits generated from diverted partnership property and partnership work product while Plaintiffs received nothing. (Compl. ¶43.)

At a minimum, if the Court concludes any portion of the unjust-enrichment claim is displaced to the extent it duplicates a trade-secret theory, the appropriate course would be to narrow the claim rather than dismiss it wholesale. That approach is especially apt here because the unjust-enrichment theory reaches the retention of benefits by entities that were formed after the initial breach but that used, monetized, or held the resulting product thereafter.

## V. EXHIBIT A AND THE ENTITY-SPECIFIC ALLEGATIONS DO NOT WARRANT DISMISSAL.

### A. The Exhibit A Argument Is a Record-Completeness Issue, Not a Pleading Deficiency.

Defendants' service-copy argument about Exhibit A does not support dismissal. Complaint ¶40 itself — without any exhibit — alleges the March 16, 2023 import from the Partnership's 'Final Wowdao' Figma file into Packdraw's own Figma file. That factual allegation is independently sufficient at Rule 12. Defendants may obtain Exhibit A in

discovery, challenge its authenticity, or test its probative value on summary judgment — but the pleading stage does not require resolution of any of that. The Complaint's allegations plead the import event with specificity; the exhibit is corroborating evidence, not a pleading prerequisite.

### B. The Entity-Specific Allegations Satisfy Rule 12.

The Complaint's allegations against the nine Defendants are organized by role, time period, and counts asserted. The following summary illustrates that the pleading is neither undifferentiated nor conclusory:

| Defendant | Alleged Role | Time Period | Key Factual Allegations | Counts |
|---|---|---|---|---|
| John Uphoff | Partner; CTO of Partnership; Packdraw developer; claimed 10% owner | 2021–present | Jointly formed Partnership with LeMond; jointly developed Prize, TokenWars, Packs.com; took contractor role at Roobet Nov. 2022; imported 'Final Wowdao' assets into Packdraw Figma file on Mar. 16, 2023; built Packdraw for Roobet; concealed development; became CTO of Packdraw (Compl. ¶¶2, 22-43) | I, II, IV, V, VI |
| Matt Duea | CEO of Raw Entertainment B.V.; primary Roobet negotiator | 2021–present | Negotiated with Partnership for game concepts, design, code, skill; represented Uphoff role would be temporary infrastructure work; instructed Uphoff to keep LeMond away from Packdraw; directed Uphoff's Packdraw work (Compl. ¶¶26-37) | II, III, IV, V, VI |
| Anthony Brennan | Roobet executive; participant in 2021 Packs.com negotiations | 2021–2022 | Received design materials from LeMond in Packs.com negotiations; directed, supported, and assisted Uphoff's transfer of design elements to Packdraw (Compl. ¶¶5, 27-36) | IV, V, VI |
| Allen Temiz | Roobet executive; participant in 2022 deal communications | 2022 | Messaged LeMond that deal was close at hand; directed, supported, and assisted Uphoff (Compl. ¶¶5, 32, 36) | IV, V, VI |
| Raw Entertainment B.V. (d/b/a Roobet) | Curaçao gaming entity; principal Roobet operating entity | 2021–present | Entity through which Roobet negotiated with Partnership and brought Uphoff inside; directed Uphoff's Packdraw work (Compl. ¶¶14, 26-37, 42) | II, III, IV, V, VI |
| Raw Entertainment Ltd. (d/b/a Roobet) | Wholly owned subsidiary of Raw Entertainment | 2021–present | Subsidiary acting as operational agent in the Roobet enterprise (Compl. ¶15) | II, III, IV, V, VI |

| | | | | |
|---|---|---|---|---|
| | B.V.; paying and operational agent | | | |
| Packdraw Limited | Cyprus entity; holder of Pack-draw product post-breach | Formed post-breach | Incorporated after initial breach; initial shareholder of PDCC; part of post-breach Packdraw holding/operating structure (Compl. ¶¶16, 18, 42-43) | IV, V, VI |
| Packdraw US, LLC | Delaware entity; Packdraw US op-erations | Formed post-breach | Incorporated after initial breach; part of post-breach Packdraw structure (Compl. ¶¶17, 42-43) | IV, V, VI |
| PDCC Ser-vices Limited | England/Wales entity; within Packdraw struc-ture | Formed post-breach | Initial shareholder was Packdraw Limited; operates within Packdraw enterprise (Compl. ¶¶18, 42-43) | IV, V, VI |

That selectivity refutes any suggestion of undifferentiated group pleading: Count II (civil conspiracy) and Count III (aiding and abetting) are not asserted against Brennan or Temiz; Count I (breach of fiduciary duty) is asserted only against Uphoff as the pleaded partner; and the post-breach Packdraw entities appear only in the equitable counts (IV through VI) consistent with their alleged later-in-time role.

Defendants' entity attack takes individual rows of this structure out of context and argues that each standalone row provides insufficient pleading. But as the chart illustrates, the allegations are organized as an enterprise pattern — the individuals at Roobet negotiating for partnership assets, the principal operating entity that directed Uphoff's work, the subsidiary executing operational functions, and the post-breach Packdraw entities holding and monetizing the resulting product. Read together, these allegations distinguish each Defendant's role, place each within a temporal sequence, and tie each to specific counts.

The entity allegations are also enough at this stage, especially when organized by enterprise rather than read in an isolated or truncated fashion, as Defendants do. As to Roobet, the Complaint alleges that Raw Entertainment B.V. is the Curaçao gaming entity

and that Raw Entertainment Ltd. is its wholly owned subsidiary acting as a paying and operational agent. (Compl. ¶¶14-15.) Plaintiffs therefore do not merely use 'Roobet' as a label untethered to pleaded facts; they allege an operating enterprise through which the negotiations with the Partnership occurred and through which Uphoff was brought inside and directed. (Compl. ¶¶27-34.) Notably, Defendants' own Answer admits precisely this characterization—that Raw Entertainment Ltd. "is a wholly owned subsidiary of Raw Entertainment B.V." and "acts as a paying and operational agent" of Roobet. (Answer ¶15.)

As to Packdraw, the Motion emphasizes that Packdraw Limited, Packdraw US, LLC, and PDCC were formed after the initial breach. (Defs.' Mem. at 23-24; Compl. ¶42.) But that timing does not defeat the claims; it helps explain Plaintiffs' theory. The Complaint alleges that when Uphoff began building 'Packdraw' in late 2022, there was no separate Packdraw corporate entity; Packdraw was a product developed within and for Roobet. (Compl. ¶¶26, 35-37.) The corporate entities later formed to hold, operate, and monetize that product — Packdraw Limited, Packdraw US, LLC, and PDCC Services Limited — are properly in the case because they allegedly received, held, or benefitted from the work product that Uphoff misappropriated while still a partner, and each continues to exploit that product commercially. (Compl. ¶¶37, 39-43.) That is a plausible basis for pleading-stage retention of those entities. To the extent Defendants contend that discovery will reveal clean lines between the Packdraw product and the post-breach entities, that is a factual inquiry for later — not a ground for dismissal.

The Complaint likewise places PDCC within the Packdraw structure by alleging that its initial shareholder was Packdraw Limited and that the Packdraw enterprise used

affiliated entities to hold and operate the post-breach product. On a Rule 12 motion, Plaintiffs are not required to map the entire internal corporate structure before discovery. If the Court concludes any defendant-specific allegation would benefit from more detail, leave to amend—not dismissal with prejudice—is the proper remedy.

## CONCLUSION

The Complaint plausibly alleges that Uphoff misused partnership property, misappropriated a partnership opportunity, concealed that conduct from his partner, and helped channel the resulting benefit to Roobet and the Packdraw entities—while the partnership statute expressly prohibits each of those acts. It also plausibly alleges concerted action and substantial assistance by Duea and the Roobet enterprise, trade-secret misappropriation under both MUTSA and the DTSA, and unjust enrichment at least in part independent of any purely statutory trade-secret theory. Each claim is supported by controlling Eighth Circuit authority and by decisions of this District in cases presenting comparable or less detailed allegations. Therefore, Defendants' Motion to Dismiss should be denied in its entirety.

If the Court concludes that any allegation warrants greater factual detail, Plaintiffs respectfully request leave to amend under Rule 15(a) rather than dismissal with prejudice. In particular, if the Court identifies any specific deficiency in the trade-secret identification or secrecy-measures allegations, or in the allegations against Packdraw Limited, Packdraw US, LLC, or PDCC Services Limited, Plaintiffs stand ready to supplement those allegations with additional factual detail consistent with *Protégé Biomedical*'s recognition that

trade-secret plaintiffs should not be required to disclose protected information in a public pleading. 394 F. Supp. 3d at 939.

Dated: April 20, 2026

WINTHROP & WEINSTINE, P.A.

By: */s/Brent A. Lorentz*
Joseph M. Windler, #0387758
Brent A. Lorentz, #0386865
Julia Abreu Siufi, #0506475
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
Tel: (612) 604-6400
Fax: (612) 604-6800
jwindler@winthrop.com
blorentz@winthrop.com
jsiufi@winthrop.com

*Attorneys for Geoffrey LeMond and Capture Design Ventures 03, LLC*

42586002v1