UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

John S. Uphoff,

Plaintiff and Counter Defendant,

v.

Geofrey Lemond and Capture Design Ventures 03, LLC,

Defendants and Counter Claimants,

and

Geoffrey LeMond and Capture Design Ventures 03, LLC,

Plaintiffs,

v.

John Uphoff, Matt Duea, Anthony Brennan, Allen Temiz, Raw Entertainment B.V. *d/b/a Roobet*, Raw Entertainment Ltd. *d/b/a Roobet*, Packdraw Limited, Packdraw US LLC, and PDCC Services Limited,

Defendants.

File No. 25-cv-4128 (ECT/DLM)

**OPINION AND ORDER**[1]

---

[1] This case began with two separate lawsuits—*Uphoff v. LeMond*, No. 25-cv-4128 (ECT/DLM), and *LeMond v. Uphoff*, No. 25-cv-4152. In an order dated February 10, 2026, I granted the parties' joint motions to consolidate the two cases under the first-filed case, No. 25-cv-4128. ECF No. 18. As part of the cases' consolidation, I ordered that the second-filed case, No. 25-cv-4152, be administratively closed and that all future filings be made in No. 25-cv-4128. *See id.* This caption is intended to reflect the consolidation, but the parties are encouraged to consider whether it makes sense to file amended pleadings that more accurately reflect the consolidation.

---

Kerry L. Middleton and Benjamin D. Sandahl, Littler Mendelson, P.C., Minneapolis, MN; Joseph Anthony Meckes, Squire Patton Boggs LLP, San Francisco, CA; and Jeffrey M. Walker, Squire Patton Boggs LLP, Columbus, OH, for John Uphoff, Matt Duea, Anthony Brennan, Raw Entertainment B.V., Raw Entertainment Ltd., Packdraw Limited, and Packdraw US LLC.

Brent A. Lorentz, Joseph M. Windler, and Julia Abreu Siufi, Winthrop & Weinstine, PA, Minneapolis, MN, for Geoffrey LeMond and Capture Design Ventures 03, LLC.

---

Geoffrey LeMond alleges that he and John Uphoff formed a partnership to develop online gaming sites.[2] The parties refer to this business simply as the "Partnership," and that convention will be followed here. LeMond claims that after the Partnership made progress on the games' development, Uphoff unlawfully conspired with others to misappropriate Partnership assets and use those assets to benefit Uphoff and his co-conspirators. Uphoff's alleged co-conspirators include businesses the parties refer to collectively as "Roobet" and individuals associated with Roobet, Matt Duea, Anthony Brennan, and Allen Temiz.

Defendants have moved to dismiss LeMond's claims against them under Federal Rules of Civil Procedure 12(b)(6) and 12(c). Defendants' motions will be granted in part and denied in part. LeMond's claim based on an "operation of law" theory of copyright ownership and his trade-secret and civil conspiracy claims are not plausibly alleged. These

[2] LeMond has a co-Plaintiff, a business organization called Capture Design Ventures 03, LLC. At least at this stage, however, the parties don't treat the organization separately from LeMond. For simplicity's sake, this order will follow the parties' lead and refer to both Plaintiffs as "LeMond."

claims will be dismissed without prejudice. LeMond's remaining claims are plausible and warrant discovery.

I[3]

LeMond and Uphoff "were close, longtime friends and business partners." Compl. ¶ 22. They have known each other since 2000 and "founded and worked on multiple startup ventures together since 2012." *Id.* In 2021, LeMond proposed that he and Uphoff launch the Partnership to "develop online games of chance utilizing blockchain technology." *Id.* ¶ 23. LeMond would be responsible for "visual and experiential design," and Uphoff would be responsible for "develop[ing] technical models, software, and blockchain code." *Id.* The Partnership would "incubate[] multiple games to increase [its] chance of market success." *Id.* "Uphoff agreed to join the Partnership and the two proceeded to work together as partners thereafter." *Id.*

Throughout 2021 and 2022, LeMond and Uphoff worked alongside other individuals the Partnership hired "to develop games of chance under various brand and project names including, without limitation," "unicorn.pizza," "crash.xyz," "The House,"

---

[3] In accordance with the Rule 12(b)(6) standards, the facts are drawn from LeMond's complaints. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). This case is somewhat unusual in that LeMond's claims and supporting factual allegations appear in two separate pleadings. The first is a Complaint he and Capture Design Ventures 03, LLC brought originally in Hennepin County (Minnesota) District Court. *See* Compl. [ECF No. 1-1, No. 25-cv-4152]. One of the defendants sued in this case, Allen Temiz, removed the case from Hennepin County District Court to this court with the consent of other defendants who had been served. *See* Notice of Removal [ECF No. 1, No. 25-cv-4152]. The second is the Counterclaim LeMond filed against Uphoff after Uphoff sued LeMond and Capture Design Ventures in this court. *See* Countercl. [ECF No. 14, No. 25-cv-4128] at 7–13. Though LeMond's Complaint is filed only in the since-closed second-filed case, No. 25-cv-4152, its allegations will be considered.

"WowDAO," "Packs.com," "TokenWars," "Prize," "Packs Protocol," and "WowDao Protocol" (collectively, the "Games"). *Id.* ¶ 25; Countercl. ¶ 12. "LeMond and the Partnership made contributions to the Games . . . while they were being developed," including "assisting in the design, funding, and supporting of the Games . . . ." Countercl. ¶ 15. And LeMond and the Partnership contributed by hiring others to aid in specific aspects of the Games' development and creation. *Id.* Individuals who developed the Games (including Uphoff) "were all paid repeatedly with Partnership funds." *Id.* The Games "were developed and stored on Partnership assets." *Id.* And the Games "were audited by third parties paid by the Partnership." *Id.* During the Games' development, "Uphoff and the other involved developers understood and acted" as if the Games belonged to the Partnership. *Id.* ¶ 16.

Between 2021 and 2022, LeMond and Uphoff raised $842,000 from investors for the Partnership. Compl. ¶ 24. The money was solicited using pitch materials listing Lemond as a co-founder and Chief Executive Officer and Uphoff as a co-founder and Chief Technical Officer of the Partnership. *Id.* The pitch materials the Partnership used to solicit investments contained references to "The House, WowDAO, and Prize." *Id.* ¶ 25. LeMond and Uphoff promised investors a percentage of the profits earned from projects developed using their invested funds. *Id.* ¶ 24.

Roobet[4] is a "crypto casino and online gambling company" in the business of developing games of chance and websites that promote them. *Id.* ¶ 26. Roobet uses "a

---

[4] The Complaint alleges there are two business entities doing business as "Roobet." Compl. ¶¶ 14–15. Defendant Raw Entertainment B.V. is an entity based in Curaçao, and

network of online influencers and extensive marketing resources to attract" consumers to its websites. *Id.* In 2021, Duea, an entrepreneur and LeMond's former neighbor, proposed a collaboration between Roobet and the Partnership. *Id.* ¶ 27. At the time, Duea was Roobet's marketing director and "claimed to possess direct access to Roobet's founders, who were also Roobet's beneficial owners and ultimate decision-makers." *Id.* "In 2022, [Duea] represented to LeMond that Duea had authority, as an executive officer of the company, to bind Roobet." *Id.* ¶ 28. "Around March of 2023, Roobet began holding Duea out as its CEO and 'co-founder,'" and Duea remained in these positions as of August 20, 2025. *Id.* ¶¶ 29, 42.

Between August 2021 and October 2022, the Partnership and Roobet engaged in "extensive business negotiations." *Id.* ¶ 30. LeMond and Duea were primarily involved in the negotiations, but other Roobet executives including Brennan and Temiz provided occasional input. *Id.* In August and September 2021, Brennan took part in negotiations concerning the building of Packs.com, "a game concept in which users would purchase packs of digital prizes." *Id.* By June 2022, negotiations were directed towards the Partnership's "flagship game," Prize. *Id.* ¶ 31. "[I]t was agreed that the Partnership would enter into a joint venture with Roobet and its brand Tokened." *Id.* "LeMond and Uphoff, on behalf of the Partnership, would work full-time to develop games with Tokened and

---

Defendant Raw Entertainment Ltd., is an entity based in Cyprus. *Id.* Raw Entertainment Ltd. is alleged to be a "wholly owned subsidiary of Raw Entertainment B.V." and assertedly "acts as a paying and operational agent of Raw Entertainment B.V." *Id.* ¶ 15. The Complaint's factual allegations do not distinguish between these two entities, referring to them simply as "Roobet." That convention will be followed here.

Roobet." *Id.* Roobet would initially contribute between three and five million dollars to support game development and marketing, including payment to Full Send, an influencer marketing company. *Id.* Profits from the games would be split between Roobet, the Partnership, and Full Send.

In July 2022, Duea and Temiz messaged LeMond stating that "a deal was close at hand." *Id.* ¶ 32. Duea then contacted LeMond, asking to speak with Uphoff. *Id.* Duea explained he'd "never hired a person without having a 1:1 convo with them." *Id.* Until then, LeMond had been the primary point person for the Partnership's negotiations. *Id.* After that, Uphoff and Duea began to speak with each other privately, excluding LeMond and the Partnership from their discussions. *Id.*

In November 2022, Duea informed LeMond that "Roobet only wanted to hire Uphoff as a contractor." *Id.* ¶ 33. "Duea stated that Uphoff's technical help was needed to fix issues Roobet was experiencing with elements of its core software infrastructure and that the resolution of these issues was the last step needed to allow the deal between the Partnership and Roobet to proceed." *Id.* LeMond relied on this representation and "agreed to allow Uphoff to join Roobet on a temporary basis, understanding that the joint venture between the Partnership and Roobet would progress more quickly with a real world demonstration of Uphoff's technical capacity and with someone within Roobet who could represent the Partnership's interests." *Id.* That same month, Uphoff began working for Roobet. *Id.* ¶ 34.

LeMond and Uphoff continued to work on Partnership matters, "including continued iterative game design and strategizing related to games developed by the

Partnership." *Id.* After joining Roobet, however, Uphoff made technical changes so that he gained exclusive control of two of the Partnership's domains, prize.xyz and wowdao.com. *Id.* Due to these changes, "among other things," LeMond no longer had access to his Partnership email. *Id.* "After multiple requests to Uphoff, LeMond regained access to his Partnership email in January of 2023, at which point he discovered that Uphoff had deleted the parties' email history and the Partnership capitalization table." *Id.*

In the early months of 2023, Uphoff started working on a game for Roobet called Packdraw. *Id.* ¶ 35. Packdraw allowed users to purchase digital packs of prizes of differing value. *Id.* Neither LeMond nor the Partnership knew that Uphoff's role at Roobet had changed "from work on infrastructure issues to game design." *Id.* Packdraw was "inescapabl[y] similar[]" to the Partnership's game, Prize, although Packdraw had "additional visual and game design elements taken from two other games developed by the Partnership—TokenWars and Packs.com." *Id.* ¶ 36. The Complaint alleges "[u]pon information and belief" that Brennan and Temiz "directed, or otherwise supported and assisted, Uphoff to take the visual and design elements from Prize, TokenWars, and Packs, to develop Packdraw without the consent or knowledge of LeMond or the Partnership." *Id.* Packdraw launched in August 2023 and quickly became a success. *Id.* ¶ 37.

Throughout 2023 and into the following year, LeMond and Uphoff's relationship deteriorated. *Id.* This resulted from Uphoff's "neglect toward Partnership duties, including his reluctance to set a launch date for any of the games the Partnership had developed." *Id.* When LeMond inquired about progress towards the deal between the Partnership and

Roobet, "Uphoff said there had not been any." *Id.* Uphoff later claimed that "Duea had instructed him to keep LeMond away from Packdraw." *Id.*

In early 2024, Uphoff informed LeMond that he could begin work on a new game for the Partnership. *Id.* ¶ 38. "Uphoff gave the impression that he was committed to the Partnership and that he was still interested in collaborating with LeMond." *Id.* "Uphoff shared ideas and information for the prospective game with LeMond, including the user interface and website designs for Packdraw, which were contained in a design software called Figma." *Id.*

In June 2024, when reviewing materials from Uphoff, "LeMond opened the Packdraw Figma file and discovered that for the past year Uphoff, on Roobet's behalf and presumably at the direction of Brennan, Temiz, and Roobet, had built and launched a game directly competitive to the suite of games developed by the Partnership." *Id.* This included "Prize—the flagship game that the Partnership had created and offered to Roobet as part of the negotiations to create a joint venture." *Id.* "[C]hange records from within the Packdraw Figma file confirmed that the first assets used in the file were imported by Uphoff on March 16, 2023 directly from the Partnership Figma file where designs for Prize were stored, 'Final Wowdao.'" *Id.* ¶ 40. "The Prize designs were then integrated with other designs that Roobet had commissioned, which were also based on designs created and shared by LeMond with Duea and Brennan back in 2021 when negotiating the creation of a joint venture for Packs.com (which Roobet had withdrawn from pursuing)." *Id.* The Complaint further alleges "[u]pon information and belief" that Uphoff "used software code belonging to the Partnership to develop Packdraw for Roobet." *Id.* ¶ 41. "As of April 21,

2025, Packdraw has seen more than . . . $259,000,000[] in user deposits," which is consistent with Uphoff's representation to LeMond, among others, in November 2024, that "Packdraw.com sees 'about 150M in deposits per year.'" *Id.* ¶ 43. "LeMond and the Partnership have received nothing in return for the use of their intellectual property and their investment of nearly one million US dollars ($1,000,000)." *Id.*

In his Counterclaim, LeMond asserts three theories of recovery: (1) He claims that the games were "works made for hire" under the Copyright Act and that, as a result, the Partnership owns the games' copyrights. Countercl. ¶¶ 20–26 (Count I). (2) He claims the Partnership holds all copyrights in the games "by operation of law." *Id.* ¶¶ 27–33 (Count II). (3) He claims alternatively that, to the extent Uphoff owns a joint interest in the games, he owes a duty to account for his share of profits from the games. *Id.* ¶¶ 34–36 (Count III). For relief, the Counterclaim seeks a declaration that all copyrights in the games "are exclusively owned and/or held by the Partnership"; a declaration that "Uphoff is willfully attempting to misappropriate the partnership's copyrights in violation of his fiduciary duties"; an order requiring Uphoff to "return all materials relating to the [g]ames . . . to the Partnership"; an order requiring Uphoff "to account and distribute all profits he obtained in exploiting the [g]ames"; dismissal of Uphoff's complaint; an award of attorneys' fees and costs, and "such other and further relief as the Court deems just and equitable." *Id.* at 13.

In his Complaint, LeMond asserts six claims. (1) LeMond asserts a state-law claim for breach of fiduciary duty against Uphoff. Compl. ¶¶ 44–48 (Count I). (2) LeMond alleges Duea, Roobet, and Uphoff entered a civil conspiracy to achieve Uphoff's breach of

fiduciary duties. *Id.* ¶¶ 49–53 (Count II). (3) LeMond claims Duea and Roobet aided and abetted Uphoff's breach of fiduciary duties. *Id.* ¶¶ 54–58 (Count III). (4) LeMond claims all Defendants violated the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01, *et seq.* (or "MUTSA"). *Id.* ¶¶ 59–67 (Count IV). (5) LeMond claims all Defendants violated the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (or "DUTSA"). *Id.* ¶¶ 68–80 (Count V). (6) LeMond alleges all Defendants were unjustly enriched. *Id.* ¶¶ 81–85 (Count VI). For relief, the Complaint seeks compensatory and punitive damages, reasonable attorneys' fees and costs, and "such other and further relief as the Court deems just and equitable." *Id.* at 19.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept a complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* A Rule 12(c) motion for judgment on the pleadings is assessed

under the same standard as a Rule 12(b)(6) motion to dismiss. *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

III

A

Begin with LeMond's counterclaims. Count I alleges the games were a "work for hire performed on behalf of [the Partnership] and subsequently are owned by [the Partnership]." Countercl. ¶ 26. Under the Copyright Act, "[c]opyright in a work . . . vests initially in the author or authors of the work." 17 U.S.C. § 201(a). There is an exception. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* § 201(b). Under the Copyright Act, a "work made for hire" includes "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1).

The disputed issue is whether the Counterclaim alleges facts plausibly showing that Uphoff was a Partnership employee. *See* ECF No. 27 at 10–14. In *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), the Supreme Court addressed how to determine whether a work was "prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1). The Court concluded that "the term 'employee' should be understood in light of the general common law of agency." *Reid*, 490 U.S. at 741. The Court explained that "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which

the product is accomplished." *Id.* at 751. To aid this inquiry, the Supreme Court identified the following factors to be considered, among others:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751 (citation modified) (citing Restatement (Second) of Agency § 220(2) (A.L.I. 1958)). "Since the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968)); *see also Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992) ("The factors should not merely be tallied but should be weighed according to their significance in the case."). Cases applying the *Reid* factors in the Rule 12(b)(6) context teach that an in-depth, factor-by-factor analysis is not necessary to determine whether a work-for-hire claim is plausible. *See, e.g.*, *Vuoncino v. Forterra, Inc.*, 140 F.4th 200, 209–11 (5th Cir. 2025) (per curiam) (reversing dismissal of complaint that included allegations sufficient to raise a plausible inference that hired party was an employee—namely, "that he 'worked for' Fabrication, held specific managerial and executive positions 'for' and 'over' Fabrication, supervised all Fabrication branches, directly reported to a senior vice president of

Fabrication, worked daily on managing Fabrication's financials, and that his position was eliminated due to restructuring within Fabrication"); *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 47 (S.D.N.Y. 2020) (applying the *Reid* factors and determining that the plaintiff alleged facts plausibly showing he was an employee).

Here, LeMond alleges facts plausibly showing that the games were works prepared by Uphoff within the scope of his Partnership employment. He alleges that "Uphoff and other developers . . . were hired to develop the [g]ames." Countercl. ¶ 15(a). He alleges the games were "developed and stored on Partnership assets." *Id.* ¶ 15(b). Though the nature of Uphoff's game-development work required a high degree of skill, game development was the Partnership's purpose. LeMond alleges that Uphoff worked for the Partnership for roughly three years. *See* Compl. ¶¶ 23, 38; *see also Aymes*, 980 F.2d at 864 (finding a two-year relationship was "a long period of time"). The pleadings reasonably permit the inference that the Partnership could task Uphoff with additional projects. They allege that Uphoff worked to develop at least nine games while working for the Partnership and that Uphoff told LeMond he had the capacity to work on an additional game. *See* Countercl. ¶ 12 (listing the games); Compl. ¶ 25 (listing several of the games); *id.* ¶ 38 ("In early 2024, . . . Uphoff told LeMond that he now had capacity to begin work on a new game for the Partnership."). The pleadings allege that the Partnership "hir[ed] others to assist with certain aspects of the development and creation of the Games" and that Partnership funds were used to pay the hired developers. Countercl. ¶ 15. The pleadings' allegations do not imply, in other words, that Uphoff was responsible for hiring his own help.

Uphoff argues that he could not have been a Partnership employee because he was a partner, but without more, this is not persuasive at the motion-to-dismiss stage. Courts have held that partners in a partnership are not employees for purposes of the Copyright Act. *See Woods v. Resnick*, 725 F. Supp. 2d 809, 824 (W.D. Wis. 2010); *Brown v. Flowers*, 297 F. Supp. 2d 846, 852 (M.D.N.C. 2003) ("Partners are not generally regarded as employees of partnerships."), *aff'd*, 196 F. App'x 178 (4th Cir. 2006); *Heimerdinger v. Collins*, No. 2:07CV00844, 2009 WL 1743764, at *3–4 (D. Utah June 18, 2009) ("[A] partner is generally not an employee."). But this is not a bright-line rule. The comments to the Second Restatement of Agency, cited by the Supreme Court in *Reid*, say that a partner in a partnership may also be a partnership employee. Restatement (Second) of Agency § 14A, cmt. a. (A.L.I. 1958) ("When one of the partners is in active management of the business or is otherwise regularly employed in the business, he is a servant of the partnership."). Status as an employee and a partner are not mutually exclusive under the common law of agency. Additionally, courts have recognized that "[s]tart-up companies often present a unique challenge to courts when attempting to discern whether an individual was an employee, an owner, or both as start-up companies conduct their businesses more informally than established businesses." *In re TLFO, LLC*, 572 B.R. 391, 437 (Bankr. S.D. Fla. 2016). Taken as true, LeMond's allegations do not enable me to conclude once and for all that Uphoff's status as a partner precludes a finding that he also was an employee.

B

As an alternative to the work-for-hire theory, LeMond alleges in Count II of his Counterclaim that the Partnership holds all copyrights in the Games "by operation of law."

Countercl. ¶ 33. Under the Copyright Act, "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law." 17 U.S.C. § 201(d)(1). The Act provides that a transfer of copyright ownership "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing," unless the copyright is transferred "by operation of law." *Id.* § 204(a). The pleadings identify no written transfer of copyright ownership, so the focus is on the meaning of the phrase "by operation of law." The Act does not define the phrase and "sparse case law addresses the transfer of copyright by operation of law." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 41 (1st Cir. 2012) (quoting *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 963 (8th Cir. 2005)). Courts have construed the "operation of law" phrasing in the Copyright Act to refer to transfers via intestate succession, corporate mergers or dissolutions, and bankruptcy. *See Brooks v. Bates*, 781 F. Supp. 202, 205–07 (S.D.N.Y. 1991) (collecting cases); *Taylor Corp.*, 403 F.3d at 963–64; Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 10.03[A][6] ("Presumably, the intent is to refer to such matters as disposition by courts in bankruptcy, probate, and the like.").

LeMond does not allege a transfer by any of these means; he relies on the corporate opportunity doctrine. ECF No. 39 at 18–21. The theory is that because Uphoff was a partner, he owed fiduciary duties to the Partnership, and his conduct in using copyrightable works for the benefit of himself and Roobet, rather than the Partnership, usurped partnership opportunities. The general rule is that "[a] partner may not appropriate a business opportunity which rightly belongs to the partnership." *Triple Five of Minn., Inc.*

*v. Simon*, 404 F.3d 1088, 1096 (8th Cir. 2005) (citing *Miller v. Miller*, 222 N.W.2d 71, 78 (1974)). Under the doctrine,

> one entrusted with the active management of a corporation, such as an officer or director, occupies a fiduciary relationship to the corporation and may not exploit his position as an 'insider' by appropriating to himself a business opportunity properly belonging to the corporation. If such a business opportunity is usurped for personal gain, it is equally well recognized that the opportunity and any property or profit acquired becomes subject to a constructive trust for the benefit of the corporation.

*Miller*, 222 N.W.2d at 78 (citing *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939)).

As a theory of copyright ownership, this is not legally viable. Courts that have addressed the meaning of transfer "by operation of law" have concluded that the phrase is limited to voluntary transfers. *See, e.g.*, *Soc'y of Holy Transfiguration Monastery, Inc.*, 689 F.3d at 41; *Time, Inc. v. Kastner*, 972 F. Supp. 236, 238 (S.D.N.Y. 1997) ("While the Copyright Act does not define transfer by 'operation of law,' courts in this Circuit have noted that transfers due to bankruptcy or mortgage foreclosure, where there is evidence of the author's express or implied consent of transfer (*e.g.* his overt conduct in filing for bankruptcy), are transfers by 'operation of law.'" (citing *Brooks*, 781 F. Supp. at 205)); *Advance Mag. Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628, 636 (D. Md. 2006) ("[T]ransfers by operation of law are expressly limited to voluntary transfers, except in bankruptcy proceedings."); *see also* Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 10.04 ("[A]lthough Section 201(d)(1) provides that a transfer of ownership of copyright may be effectuated by 'operation of law' rather than by 'conveyance,' such operation of law must be triggered by the express or implied consent of the author."). The

Eighth Circuit seems to share this understanding. *Taylor Corp.*, 403 F.3d at 963 (8th Cir. 2005) ("[T]he lessons to be drawn from Professor Nimmer are that transfers of copyrights by operation of law are limited in number, and depend upon circumstances which establish the author's express or implied consent." (quoting *Brooks*, 781 F. Supp. at 205)). Here, LeMond does not allege that Uphoff voluntarily transferred ownership of the games' copyrights to the Partnership under any realistic understanding of that concept. The pleadings allege something quite different—that Uphoff misappropriated Partnership assets and that a court judgment is necessary to compel Uphoff to return the copyrights to the Partnership. This claim will be dismissed.[5]

C

In Count III of the Counterclaim, Lemond alleges that, at most, Uphoff holds a "joint ownership interest shared with Defendants and/or the Partnership," and that to the extent Uphoff has profited from the Games, he "owes a duty to account for and share such profits with Defendants and/or the Partnership." Countercl. ¶¶ 34–36. Under the Copyright Act, "[t]he authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). "Authorship is a question of fact." *Gaylord v. United States*, 595 F.3d 1364, 1377 (Fed. Cir. 2010). "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary

---

[5] LeMond cites *Robinson v. R & R Pub. Inc.*, 943 F. Supp. 18 (D.D.C. 1996) and *Hill v. Nat'l Ass'n of Flight Instructors, Inc.*, No. CV 09-6851 CAS (JCx), 2009 WL 10673116 (C.D. Cal. Nov. 23, 2009), for the proposition that a transfer of copyright ownership via the corporate opportunity doctrine constitutes a transfer "by operation of law." ECF No. 39 at 19–20. These cases do not address the voluntariness requirement, however, making them unpersuasive.

whole." 17 U.S.C. § 101. "[I]f author B's contribution when combined with author A's contribution results in recasting, transforming or adapting A's contribution, then the two contributions may be said to be inseparable." Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* § 6.04 (citation modified). "If the process is simply one of assembling into a collective whole A's and B's respective contributions, without thereby recasting A's contribution, then the two contributions may be said to be interdependent." *Id.* (citation modified). "Joint authorship entitles the co-authors to equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made." *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998); *accord Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1065 n.2 (7th Cir. 1994) (citation modified); *Cmty. for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1498 (D.C. Cir. 1988), *aff'd*, 490 U.S. 730 (1989).

"[A] co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Gaylord*, 595 F.3d at 1377 (quoting *Thomson*, 147 F.3d at 200). Regarding the first element, putative co-authors "must supply more than mere direction or ideas: [they] must 'translate an idea into a fixed, tangible expression entitled to copyright protection.'" *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989) (citation modified) (quoting *Reid*, 490 U.S. at 737); *see also Gaylord*, 595 F.3d at 1379 (holding that "comments[] and suggestions" do not constitute sufficient contributions). Importantly, the contributions of each author need not "be equal either in

quantity or quality." Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* § 6.03. With respect to the second element, "the intention that their contributions be merged, must exist at the moment in time when the work is created, not at some later date." *Id.*; *see also Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 90 (S.D.N.Y. 1996); *Eckert v. Hurley Chicago Co.*, 638 F. Supp. 699, 704 (N.D. Ill. 1986).

The pleadings plausibly allege co-authorship. They allege that Uphoff was responsible for "develop[ing] technical models, software, and blockchain code," and that LeMond was responsible for the "visual and experiential design" of the games. Compl. ¶ 23. Construed in the light most favorable to LeMond, these allegations permit the inference that LeMond's contribution to the games' visual and experiential design constituted more than mere comments or suggestions—that LeMond contributed in some tangible way to the games' design, such as by creating sounds or graphics amounting to inseparable or interdependent components of the games.

D

Turn now to the claims in LeMond's Complaint, beginning with his claim in Count I that Uphoff breached fiduciary duties he owed to LeMond, the Partnership, and the Partnership's investors. Under Minnesota law, "[a] breach of fiduciary duty claim consists of four elements: duty, breach, causation, and damages." *Hansen v. U. S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019); *see also Rucki v. Grazzini*, No. A09-0694, 2010 WL 1286725, at *5 (Minn. Ct. App. Apr. 6, 2010) ("[T]he plaintiff must demonstrate the existence of a fiduciary duty, breach of that duty, causation, and damages."). "Minnesota law imposes the highest duty of integrity and good faith on partners in their dealings with

each other."[6] *Triple Five of Minn.*, 404 F.3d at 1095 (citing *Venier v. Forbes*, 25 N.W.2d 704, 708 (Minn. 1946)); *see also Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009) (recognizing that business partnerships trigger per se fiduciary relationships). Relevant here, partners must (1) "account to the partnership and hold as trustee for it any property, profit, or benefit . . . derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity"; (2) "refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership"; and (3) "refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." Minn. Stat. § 323A.0404(b), (c).

LeMond plausibly alleges that Uphoff breached his fiduciary duties to the Partnership in three ways. First, LeMond claims that Uphoff usurped a Partnership opportunity and competed with the Partnership. Partners "may not usurp or divert for their own benefit business opportunities that properly belong to the partnership." *Triple Five of Minn.*, 404 F.3d at 1095 (citing *Miller*, 222 N.W.2d at 78). "An opportunity that is closely related to the entity's existing or prospective line of business, would competitively advantage the partnership, and is one that the partnership has the financial ability, knowledge and experience to pursue is a partnership opportunity." *Id.* at 1096. Whether an opportunity belongs to the partnership is a factual determination. *Id.* at 1096–97; *see* Minn. Stat. § 323A.0404(b)(3) (prohibiting a partner from "competing with the partnership

[6] Whether LeMond and Uphoff formed a partnership is a separate fact question. *Cyrus v. Cyrus*, 64 N.W.2d 538, 541 (Minn. 1954). For purposes of this motion, the Partnership's existence is not disputed. ECF No. 31 at 8 n.1.

in the conduct of the partnership business"). LeMond alleges Uphoff usurped a Partnership opportunity by providing Roobet with technical expertise and game-design work Roobet previously sought from the Partnership, thereby excluding the Partnership from the benefits of an agreement with Roobet.

The Complaint's allegations make this theory plausible. The Complaint alleges Roobet was particularly interested in the Partnership's game, Prize, and intended to enter a joint venture to develop the game. Compl. ¶ 31. The Complaint alleges Roobet intended to invest between three and five million dollars, initially, and that the Partnership would benefit from profits generated by the games. *Id.* In a turn of events, following discussions between Duea and Uphoff, Roobet determined it wanted to hire Uphoff as a contractor. *Id.* ¶¶ 32–33. LeMond "agreed to allow Uphoff to join Roobet on a temporary basis," relying on Duea's statement that Roobet needed Uphoff's assistance to address software infrastructure issues prior to entering a joint venture with the Partnership. *Id.* ¶ 33. After Uphoff joined Roobet, LeMond discovered records indicating Uphoff imported Partnership files for the game Prize to Roobet's Packdraw Figma file. *Id.* ¶ 40. And Packdraw bore "an inescapable similarity" to Prize. *Id.* ¶ 36. That the Partnership raised over $800,000 from investors and engaged in lengthy negotiations with Roobet regarding the possibility of entering a joint venture together further indicate the Partnership was equipped to enter into such an agreement. *See* Compl. ¶¶ 24, 30. These allegations plausibly show that Uphoff usurped the Partnership's opportunity with Roobet and competed with the Partnership in its business of developing online games of chance.

Second, LeMond claims Uphoff failed to "account to the partnership and hold as trustee for it any property, profit, or benefit . . . derived from a use by the partner of partnership property." Minn. Stat. § 323A.0404(b)(1). Uphoff's primary contention to support this theory's dismissal is that the Partnership did not own the games' copyrights, but the plausibility of LeMond's work-for-hire and co-authorship counterclaims, addressed above, refutes this contention.[7]

Third, LeMond claims Uphoff breached his fiduciary duties by concealing his work developing Packdraw. Under Minnesota law, "[w]here a fiduciary relationship exists, silence may constitute fraud." *Appletree Square I Ltd. P'ship v. Investmark, Inc.*, 494 N.W.2d 889, 892 (Minn. Ct. App. 1993). The duty to disclose extends to "material facts." *Triple Five of Minn.*, 404 F.3d at 1098. Again, the Complaint plausibly alleges this theory. While working for Roobet, Uphoff "deleted the parties' email history and the Partnership capitalization table," prevented LeMond from accessing his Partnership email account, imported assets from the Prize Figma file to the Packdraw Figma file, and "built and launched" Packdraw. Compl. ¶¶ 34, 39–40. These actions permit the inference that Uphoff entered his Roobet employment under the guise of providing "technical help" to address Roobet's "software infrastructure," Compl. ¶ 33, when his undisclosed intention was to misappropriate Partnership assets for his (and Roobet's) benefit.

---

[7] This determination makes it unnecessary to address LeMond's alternative contention that his duty-to-account theory does not depend on the Partnership's ownership of the games' copyrights. *See* ECF No. 38 at 20.

E

LeMond claims in Count II of his Complaint that Uphoff, Duea, and Roobet engaged in a civil conspiracy to achieve Uphoff's fiduciary breaches. Compl. ¶¶ 49–53. To state a civil conspiracy claim, a plaintiff must plausibly allege that defendants agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means and took concerted actions to achieve that purpose. *Marty H. Segelbaum, Inc. v. MW Cap., LLC*, 673 F. Supp. 2d 875, 880 (D. Minn. 2009) (citing *Harding v. Ohio Cas. Ins. Co. of Hamilton*, 41 N.W.2d 818, 824 (Minn. 1950)); *Lipka v. Minn. Sch. Emps. Ass'n, Loc. 1980*, 537 N.W.2d 624, 632 (Minn. Ct. App. 1995), *aff'd*, 550 N.W.2d 618 (Minn. 1996). "Allegations of a conspiracy, absent supporting facts, do not establish a claim upon which relief may be granted." *Marty H. Segelbaum, Inc.*, 673 F. Supp. 2d at 881 (quoting *Occhino v. Lannon*, 150 F.R.D. 613, 623 (D. Minn. 1993), *aff'd*, 19 F.3d 23 (8th Cir. 1994)). A "[c]ivil conspiracy requires the conspirators to have a meeting of the minds as to plan or purpose of action to achieve a certain result." *Steele v. Mengelkoch*, No. A07-1375, 2008 WL 2966529, at *2 (Minn. Ct. App. Aug. 5, 2008) (citing *Bukowski v. Juranek*, 35 N.W.2d 427, 429 (1948)); *see also Dunn v. Assocs. in Psychiatry & Psychology, P.A.*, No. 22-cv-615 (NEB/DJF), 2022 WL 22694603, at *11 (D. Minn. Nov. 10, 2022) ("Allegations of conspiracy . . . must be pled with sufficient specificity and factual support to suggest a meeting of the minds." (quoting *Manis v. Sterling*, 862 F.2d 679, 681 (8th Cir. 1988)). Allegations of parallel conduct are insufficient to plausibly allege a civil conspiracy. *Buetow v. A.L.S. Enters., Inc.*, 564 F. Supp. 2d 1038, 1042 (D. Minn. 2008). A civil conspiracy "must be based on an underlying intentional tort." *Marty H. Segelbaum, Inc.*,

673 F. Supp. 2d at 880 (citing *Senart v. Mobay Chem. Corp.*, 597 F. Supp. 502, 505 (D. Minn. 1984)). Breach of fiduciary duty is sufficient to support a civil conspiracy claim. *See Christopher v. Hanson*, No. 09-cv-3703 (JNE/JJK), 2011 WL 2183286, at *11 (D. Minn. June 6, 2011)).

The Complaint does not plausibly allege a civil conspiracy. The Complaint alleges Duea was involved in the negotiations between the Partnership and Roobet, that he communicated with Uphoff privately, that he told LeMond that Roobet wanted to hire Uphoff as a contractor to address software infrastructure issues to move forward with the Partnership/Roobet deal, and that he "instructed [Uphoff] to keep LeMond away from Packdraw." Compl. ¶¶ 27, 32–33, 37. The Complaint also alleges that LeMond shared game "designs" with Duea, although it does not indicate what those designs were. *Id.* ¶ 40. The factual allegations regarding Duea end there. These allegations do not support the reasonable inference that Duea and Uphoff reached an agreement for the purpose of breaching Uphoff's fiduciary duties. The allegations are equally consistent with lawful conduct. *See St. Jude Med. S.C., Inc. v. Hanson*, No. 13-cv-2463 (RHK/JSM), 2014 WL 12656624, at *10 n.12 (D. Minn. Aug. 6, 2014) ("At most, the factual allegations . . . indicate that Heartcare and Koop had an agreement with Biotronik to recruit and hire Hanson away from St. Jude to work for Biotronik. St. Jude does not recite any factual allegations to establish that an agreement was actually reached to accomplish an unlawful purpose.").

The same is true of the Complaint's conspiracy allegations regarding Roobet. Under Minnesota law, "a corporation is charged with constructive knowledge . . . of all material

facts of which its officer or agent . . . acquires knowledge while acting in the course of employment within the scope of his or her authority." *SCI Minnesota Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 866 (Minn. 2011) (quoting *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 895–96 (Minn. 2006)). In addition to the allegations regarding Duea, the Complaint alleges "[u]pon information and belief" that Brennan and Temiz "directed, or otherwise supported and assisted, Uphoff to take the visual and design elements from Prize, TokenWars, and Packs, to develop Packdraw without the consent or knowledge of LeMond or the Partnership." Compl. ¶ 36. The Complaint also alleges that "presumably" Brennan, Temiz, and Roobet "direct[ed]" Uphoff to build and launch Packdraw, which is "directly competitive" to the Games. Compl. ¶ 39. "In the post-*Twombly* and *Iqbal* era, . . . merely pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." *Armstrong v. City of Minneapolis*, 525 F. Supp. 3d 954, 966–67 (D. Minn. 2021) (quoting *Kampschroer v. Anoka County*, 57 F. Supp. 3d 1124, 1143 (D. Minn. 2014), *aff'd on other grounds*, 840 F.3d 961 (8th Cir. 2016)); *see also Guse v. Fed. Nat'l Mortg. Ass'n*, No. 13-cv-800 (PJS/JSM), 2014 WL 538631, at *7 (D. Minn. Feb. 11, 2014) ("While it is true that the Eighth Circuit has yet to address whether a pleading based on information and belief is sufficient to state a claim, the Eighth Circuit and courts in this District have unequivocally held that conclusory allegations lacking in factual support are insufficient to satisfy the Rule 8 pleading standards or the standards proscribed by the Supreme Court in *Iqbal* and *Twombly*." (citation modified)). For this reason, the

Complaint's allegations regarding Temiz and Brennan—and therefore Roobet—are insufficient.

F

In the Complaint's Count III, LeMond alleges that Duea and Roobet aided and abetted Uphoff's breach of fiduciary duties. Compl. ¶¶ 54–58. To state a claim for aiding and abetting the tortious conduct of another, a plaintiff must plausibly allege: "(1) the primary tort-feasor . . . commit[ted] a tort that cause[d] an injury to the plaintiff; (2) the defendant . . . [knew] that the primary tort-feasor's conduct constitute[d] a breach of duty; and (3) the defendant . . . substantially assist[ed] or encourage[d] the primary tort-feasor in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999). The last two elements are evaluated "in tandem." *Id.* at 188 (quoting *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1495 (8th Cir. 1997)). In other words, "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Id.* (citation modified). "Whether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case," including "the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind." *Id.* To sufficiently allege knowledge, the complaint must set forth facts that give rise to the plausible inference that the "aider-and-abettor *actually knew* of the underlying wrongs committed." *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 857 (D. Minn. 2013), *aff'd*, 764 F.3d 833 (8th Cir. 2014) (citation modified); *Zayed v. Associated Bank, N.A.*,

779 F.3d 727, 733–35 (8th Cir. 2015) (applying the *Iqbal*/*Twombly* standard to the "actual knowledge" element of an aiding-and-abetting claim). "An aider and abettor's knowledge of the wrongful purpose is a crucial element in aiding or abetting cases." *Zayed*, 779 F.3d at 733 (quoting *E-Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 633 (8th Cir. 2012)). "In order to provide substantial assistance, 'the defendant must have some degree of knowledge that his actions are aiding the primary violator.'" *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 841 (8th Cir. 2014) (citation modified) (quoting *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991)). Because "some element of blameworthiness must be present in the defendant's assistance," it follows that "conduct that inadvertently advances the breach of a fiduciary duty does not amount to substantial assistance." *Id.* (citation modified). That a defendant's conduct "might be consistent with" the provision of substantial assistance does not suffice. *See id.*

The Complaint plausibly alleges that Duea and Roobet aided and abetted Uphoff's breach of fiduciary duty. It is plausible that Duea and Roobet knew Uphoff owed fiduciary duties to the Partnership. It may be inferred that Duea knew Uphoff and LeMond were in a Partnership together given that Duea "proposed a potential collaboration between Roobet and the Partnership" and was involved in "extensive business negotiations" with the Partnership. Compl. ¶¶ 27, 30. It is also plausible that Duea knew Uphoff owed fiduciary duties to the Partnership considering his business knowledge and experience, particularly as Roobet's CEO. *See* Compl. ¶ 29. It is also plausible Duea—and therefore Roobet—had actual knowledge that Uphoff usurped the Partnership's corporate opportunity. Duea proposed a collaboration between the Partnership and Roobet and remained involved in the

subsequent negotiations. *See* Compl. ¶¶ 27, 29–30. The negotiations involved the Partnership's game, Prize, and eventually it was "agreed" that the Partnership would "develop games" and Roobet would invest in game development and marketing. *Id.* ¶ 31. Duea was personally responsible for Uphoff's hiring. *Id.* ¶¶ 32–33. After Uphoff's job responsibilities at Roobet shifted toward game development, Duea instructed Uphoff to "keep LeMond away from Packdraw," *id.* ¶ 37, indicating he was aware that Uphoff was involved in game development for Roobet, the precise task that would have been the Partnership's responsibility had Roobet and the Partnership agreed to collaborate. These allegations provide a plausible basis to infer that Duea and Roobet had actual knowledge that Uphoff usurped the Partnership's opportunity. And the allegations plausibly show that Duea or Roobet "substantially assisted or encouraged" Uphoff in breaching his fiduciary duties by usurping the Partnership's corporate opportunity. Duea and Roobet were responsible for hiring Uphoff, creating the path by which Uphoff could take the Partnership's place in developing games for Roobet, and it seems reasonable to infer that transitioning from addressing software infrastructure issues to game development required Duea and Roobet's substantial assistance.

G

In Counts IV and V, LeMond brings misappropriation claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.02–.03. To prevail under either statute, LeMond must allege facts plausibly showing that the Partnership had one or more "trade secret[s]" and that Uphoff "misappropriat[ed]" them. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*,

970 F.3d 1010, 1016–17 (8th Cir. 2020). Because the two statutes "share functionally equivalent definitions" of their key terms, these claims will be analyzed together. *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018); *accord MPAY Inc.*, 970 F.3d at 1017 n.1. "The DTSA and MUTSA define a 'trade secret' as 'information' that '(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Prime Therapeutics*, 354 F. Supp. 3d at 967 (quoting *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018)); *see* 18 U.S.C. § 1839(3); Minn. Stat. § 325C.01, subd. 5. A plaintiff need not "paradoxically jeopardize" its trade secrets by giving everything away just to prove they exist, *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 939 (D. Minn. 2019) (citation omitted), but it does need to "define its alleged trade secrets with sufficient specificity," *Cambria Co. v. Schumann*, No. 19-cv-3145 (NEB/TNL), 2020 WL 373599, at *4 (D. Minn. Jan. 23, 2020) (citation omitted).

The Complaint identifies the putative trade secrets at a high level:

> digital programs, visual design, player incentive and game mechanic design, economic models, user interface and user experience design, software code, software processes and system architecture, competitor research, blockchain code, and methods and techniques for applying blockchain technologies to games of chance.

Compl. ¶ 60. In his briefing, LeMond argued that this description is not intended to be a "loose catalogue of categories," but to describe a "single nonpublic compilation," namely

> the integrated body of design, game-mechanic, economic-model, user-interface, software, system-

> architecture, competitor-research, and blockchain-code work developed within a closely held pre-launch venture for three specific products — Prize, TokenWars, and Packs.com — and stored in specific private repositories, including the Partnership's 'Final Wowdao' Figma file and code repositories used for Partnership development.

ECF No. 38 at 31–32. The problem with this contention is that there are no factual allegations in the Complaint regarding TokenWars and Packs.com that would support the claim that information pertaining to those two Games had been misappropriated. *See generally* Compl. There are no allegations that those two Games were stored on the Final Wowdao Figma file. *See* Compl. ¶ 40. Trade-secret claims regarding TokenWars and Packs.com are not plausibly alleged. Though the Complaint alleges that Prize was stored on the Final Wowdao Figma file and that change records indicate Uphoff imported "assets" on the Wowdao Figma file to the Packdraw Figma file, Compl. ¶ 40, the Complaint does not plausibly allege that the compilation of information regarding Prize is a trade secret. The Complaint does not allege that Prize's "body of design," "economic-model," "user-interface," or "techniques for applying blockchain technologies to games of chance," for example, are not widely known or utilized within the gaming industry. If the Prize-related information was not generally known, there are no allegations indicating the Partnership took any steps to secure its secrecy. It is true that in a closely held business, it may be reasonable to "rel[y] on only fiduciary duties to preserve confidential information." *Gilk v. Fisher*, No. 25-cv-2158 (JRT/LIB), 2025 WL 1920496, at *5 (D. Minn. July 11, 2025) (citing *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011)). But the pleadings indicate the Partnership hired several other individuals

to assist in the games' development. Countercl. ¶ 15. And, unlike Uphoff, there is no indication those individuals were under any fiduciary obligation to maintain the games' secrecy. Nor does the Complaint allege that the hired individuals were subject to any confidentiality agreement. *See AvidAir Helicopter Supply, Inc.*, 663 F.3d at 974 ("[T]he existence of confidentiality agreements [is a] frequently-considered factor[] in establishing or denying a trade secret claim." (citing, among others, *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 899–900 & n.4 (8th Cir. 2005))).

H

In Count VI, LeMond asserts an unjust-enrichment claim, alleging that "Defendants knowingly received, retained, and continue to use improperly obtained Partnership property without compensation despite previously engaging in extensive business negotiations for use of the very same Partnership property." Compl. ¶ 82. "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when *retention of the benefit* is not legally justifiable." *Hepfl v. Meadowcroft*, 9 N.W.3d 567, 573 (Minn. 2024) (quoting *Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023)). To state an unjust enrichment claim, a plaintiff must plausibly allege that a defendant "has knowingly received or obtained something of value for which [he] in equity and good conscience should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996). Under Minnesota law, a claim of unjust enrichment is unavailable "where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature." *Finn v. Moyes*, No. 14-cv-1293 (JRT/TNL), 2017 WL 1194192, at *16 (D. Minn. Mar. 30, 2017) (quoting *United States v.*

*Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013)). A plaintiff need not pursue a legal remedy for an unjust enrichment claim to be barred, as "it is the existence of an adequate legal remedy that precludes unjust enrichment recovery." *Bame*, 721 F.3d at 1031. An unjust enrichment award may not be based on a legal claim, even if a plaintiff does not prevail on the legal claim, because in that circumstance an "adequate legal remedy [is] *available*." *Ventura v. Kyle*, 825 F.3d 876, 887 n.10 (8th Cir. 2016). "District courts routinely dismiss unjust enrichment claims where the plaintiff pleaded and pursued both equitable and legal claims simultaneously, as well as where the plaintiff failed to pursue adequate legal remedies." *Bame*, 721 F.3d at 1031.

The unjust-enrichment claim will not be dismissed. Breach-of-fiduciary-duty claims do not displace unjust-enrichment claims. *See Shepherd of the Valley Lutheran Church of Hastings v. Hope Lutheran Church of Hastings*, 626 N.W.2d 436, 443 (Minn. Ct. App. 2001); *Com. Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 778 (Minn. Ct. App. 2006). Though trade-secret claims provide a legal remedy, *see* 18 U.S.C. § 1836(b); Minn. Stat. § 325C.02–.03, courts have held that when a plaintiff alleges the defendant was unjustly enriched "by something that is not covered by DTSA or MUTSA," the unjust enrichment claim should survive a motion to dismiss. *Schwan's Co. v. Cai*, No. 20-cv-2157 (JRT/HB), 2021 WL 5745791, at *9 (D. Minn. Dec. 2, 2021); *Polaris Indus., Inc. v. Mangum*, 690 F. Supp. 3d 966, 973 (D. Minn. 2023) (allowing unjust enrichment claim to proceed where the property encompassed by unjust enrichment claim included property that was not trade secret property). Here, the Complaint does not plausibly allege trade-secret claims, meaning the unjust-enrichment claim concerns

property not covered by the trade-secret statutes. And though Uphoff also argues the unjust-enrichment claim should be dismissed because LeMond failed to allege improper underlying conduct, ECF No. 31 at 31, this argument fails because I concluded that LeMond's claims of breach of fiduciary duty and aiding and abetting a breach of fiduciary duty survive the motion to dismiss.

**ORDER**

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Plaintiff and Counterclaim Defendant John S. Uphoff's Motion to Dismiss Counterclaims [ECF No. 26] is **GRANTED IN PART** and **DENIED IN PART** as follows: The motion is **GRANTED** with respect to Count II, and the motion is **DENIED** with respect to Counts I and III. Count II of the Counterclaim is **DISMISSED WITHOUT PREJUDICE**.

2. Defendants John Uphoff, Matt Duea, Allen Temiz, Anthony Brennan, Raw Entertainment Ltd., Packdraw US, LLC, and Packdraw Ltd's Motion to Dismiss Plaintiff's Complaint [ECF No. 30] is **GRANTED IN PART** and **DENIED IN PART** as follows: The motion is **GRANTED** with respect to Counts II, IV, and V, and the motion is **DENIED** with respect to Counts I, III and VI. Counts II, IV, and V are **DISMISSED WITHOUT PREJUDICE**.

Dated: September 21, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
Chief Judge, United States District Court